In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR # 25A CONCERNING HOUSING UNIT CONSTRUCTION LIMITS:

Jerry G. PERCY, Petitioner,

v.

Dan HAYES and Eric Levine, Respondents,

and

Rebecca Lennahan, Victoria Buckley, and Richard Westfall, Title Board.

No. 97SA242.

Supreme Court of Colorado, En Banc.

March 9, 1998.

Susan E. Burch, Denver, for Petitioner.

Dan Hayes, Arvada, Pro Se.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, for Title Board.

Justice BENDER delivered the Opinion of the Court.

The petitioner, Jerry G. Percy (Percy), is a registered elector of Colorado who brings this original proceeding pursuant to section 1–40–107(2), 1 C.R.S. (1997), to review the action taken by the title setting board (the Board) in fixing a title, ballot title and submission clause, and summary (titles and summary) for a proposed constitutional amendment designated "1997–98 # 25A" (the initiative). We hold that the Board had jurisdiction to set the titles and summary, the titles and summary fairly express the intent and meaning of the initiative, and that the fiscal impact statement is adequate. We therefore affirm the action of the Board.

## I.

The proposed Initiative would add a new section to article XVIII of the Colorado Constitution:

Be it enacted by the People of the State of Colorado:

Article XVIII of the Constitution of the State of Colorado is amended by the addition of a new Section 14, to read:

Section 14. Growth Limitation. Beginning in 1999 and thereafter every county, city and county, city, or town, whether statutory or home rule, as independent zoning jurisdictions shall limit the number of housing units approved for construction annually so that each of these local governments does not exceed the projected national growth rate in households for that year derived from data and definitions provided by the United States bureau of the census or its successor and updated annually by the appropriate state agency for use by such local governments. An additional two-tenths of one percent housing growth or twenty-five housing units, whichever is larger, is also permitted when these housing units are affordable, low-cost or senior housing. Specific residential developments of a defined number of housing units in excess of the limit as well as a change in the growth rate may be approved by the popular vote of the registered electors of a local government as separate ballot issues at a state general election, biennial local district election, or on the first Tuesday in November of odd-numbered years.

The Board's titles and summary for this proposal are attached as an appendix to this opinion. The petitioner asserts that (1) the Board had no jurisdiction to set the titles and summary for any proposal between the third Wednesday in May and the first Wednesday in December in any year and therefore was without jurisdiction to set the titles and summary for this initiative; (2) the titles and summary is so detailed that it does not correctly and fairly express the true intent and meaning of the proposal to its intended audience; and (3) the fiscal impact statement misrepresents or fails to convey information provided to the Board.

## II.

▮ The proponents filed the final draft text of the proposed initiative on June 20, 1997. The Board initially set the titles and summary on July 3, 1997. Percy filed a motion for rehearing on July 9, 1997. On July 16, 1997, the Board denied Percy's motion for rehearing, but partially reworded the titles and summary. Percy argues that the Board lacked jurisdiction to set titles and summary between the third Wednesday in May and the first Wednesday in December in any year. As required under section 1–40–106(1), 1 C.R.S. (1997), the last meeting of the Board "shall be held no later than the third Wednesday in May in the year in which the measure is to be voted on," and for the 1997 elections this meant May 21, 1997. Percy's final draft of the proposed initiative was submitted on June 20, after the deadline for the Board to consider the initiative for the upcoming 1997 election.

Because the Board could not consider the draft for the 1997 ballot, the earliest the measure would ·be eligible for placement on the ballot would be 1998. We recently resolved this argument by our holding in *In re Proposed Initiative # 26 Concerning School Impact Fees,* No. 97SA273, slip op. at 13–14, —— P.2d ——, —— (Colo. Feb. 17, 1998), where we stated: "the Board possessed the authority in this case to set the titles and summary [after the third Wednesday in May in 1997] because this measure was eligible for placement on the ballot, at the earliest, in November 1998."

## III.

▮ Additionally, Percy challenges the titles and summary claiming both contain details that mislead. He argues that the title and summary do not correctly and fairly express the true intent and meaning of the proposal.

Section 1–40–106(3)(b), 1 C.R.S. (1997), provides guidance to the Board in determining titles for proposed initiatives. This provision states:

In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall,

whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *The title for the proposed law or constitutional amendment, which shall correctly and fairly express the true intent and meaning thereof,* together with the ballot title, submission clause, and summary, shall be completed within two weeks after the first meeting of the title board.... Ballot titles shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

§ 1–40–106(3)(b), 1 C.R.S. (1997) (emphasis added).

■ Our judicial role in reviewing the titles and summary set by the Board is narrow. In *In re Workers Comp. Initiative,* 850 P.2d 144, 146 (Colo.1993), we explained:

In reviewing the Board's title setting process, the law is settled that this court should not address the merits of the proposed initiative and should not interpret the meaning of proposed language or suggest how it will be applied if adopted by the electorate; we should resolve all legitimate presumptions in favor of the Board; *and we will not interfere with the Board's choice of language if the language is not clearly misleading.* Our duty is to ensure that the title, ballot title, submission clause, and summary fairly reflect the proposed initiative so that petition signers and voters will not be misled into support for

or against a proposition by reason of the words employed by the Board.

(Emphasis added.)

Percy contends that "[w]hile the titles unambiguously state the principle of the proposal, housing unit construction limits, they then proceed to envelop the intended audience in a myriad of details that confound rather than enlighten the reader." He points out that the text of the proposal itself is only slightly longer than the titles and summary.

It is not this court's task "to write the best possible ballot title but simply to eliminate a title which is insufficient or unfair." *In re Proposed Election Reform Amendment,* 852 P.2d 28, 35 (Colo.1993). Accordingly, we have upheld the Board's formulation of titles and summaries where "[t]he language used by the Board properly repeats the operative language of the proposed amendment itself and expresses the true intent and meaning of the measure." *In re Proposed Initiative Concerning "Automobile Insurance Coverage,"* 877 P.2d 853, 857 (Colo.1994).

Upon review of the titles and summary, it is apparent that the Board repeated or reworded much of the language of the proposed initiative. We agree that the Board's titles and summary contain complex clauses; however, we conclude that the language used by the Board is not misleading and that it sufficiently reflects the proposed initiative. We thus hold that the titles and summary fairly express the intent and meaning of the proposed initiative as required by section 1–40–106(3)(b), 1 C.R.S. (1997).

## IV.

■ Lastly, Percy claims the fiscal impact statement formulated by the Board is inadequate under the guidelines set forth in section 1–40–106(3)(a), 1 C.R.S. (1997).[1] That

1. Section 1–40–106(3)(a), 1 C.R.S. (1997), provides:

The title board shall prepare a clear, concise summary of the proposed law or constitutional amendment. The summary shall be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure. The title board may request assistance in the preparation of the summary from the legislative council and, if, in the opinion of the title board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdi-

visions, shall request assistance in such matter from the office of state planning and budgeting or the department of local affairs. When the title board requests fiscal impact information from the office of state planning and budgeting or the department of local affairs, the fiscal impact information shall be filed with the secretary of state by 12 noon on the Friday before the meeting of the title board at which the draft is to be considered. The legislative council, the office of state planning and budgeting, and the department of local affairs shall furnish any assistance requested, and the summary shall include an estimate of any such

statute requires the Board to formulate a statement estimating the fiscal impact of a proposed initiative on the state or any of its political subdivisions if the Board believes the initiative will have such an impact. *See* § 1–40–106(3)(a). The Board must request assistance from the office of state planning and budgeting or the department of local affairs in preparing the statement. *See id.*

Here, the department of local affairs issued the following comments regarding the estimated fiscal impact of the proposed initiative:

> It should be noted that the General Assembly may need to define other aspects of the measure as well, including how any annexed territory may affect the calculation of a county's limitation.
>
> Even by making a number of assumptions on these issues, we cannot determine the fiscal impact resulting from the measure. It is clear that there will be a *negative fiscal impact* on local governments which would have realized revenue growth from a growing population, and especially those which were expecting higher growth and had built facilities in anticipating it.

(Emphasis in original.)

The fiscal impact statement formulated by the Board reads:

> The cumulative fiscal impact of this measure on local governments is indeterminate. However, the measure *may* have a negative fiscal impact on those local governments that would otherwise realize greater revenues because of population growth.
>
> The measure would have no direct fiscal impact on state government. However, a negative fiscal impact may result if, by restricting housing construction, the measure drives housing prices up and increases the demand for state and local housing assistance and welfare programs.

(Emphasis added.)

█ Percy contends that the Board's fiscal impact statement communicates only a possible negative fiscal impact on local governments, contrary to the observation by the department of local affairs that negative fiscal impact on some local governments is a

fiscal impact, together with an explanation

certainty. However, section 1–40–106(3)(a) does not limit the Board to information submitted by the department of local affairs or the office of state planning and budgeting in formulating a fiscal impact statement. Further, the Board is not required to accept at face value the information provided to it. *See In re Proposed Initiative "1997–98 # 10,"* 943 P.2d 897, 900 (Colo.1997).

At the hearing, the proponents of the measure presented studies tending to show that the initiative would have little or no fiscal impact on the state or any of its political subdivisions. Faced with this conflicting evidence, the Board determined, consistent with its discretionary authority, that the proposed measure "may" have a negative fiscal impact on certain local governments. The fiscal impact statement is therefore adequate.

### V.

Accordingly, we hold that the Board had jurisdiction to set the titles and summary, the titles and summary fairly express the intent and meaning of the proposed initiative, and the fiscal impact statement is adequate. We therefore affirm the action of the Board.

### *APPENDIX*

### PROPOSED INITIATIVE
### "1997–98–# 25A"

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE CONSTITUTION OF THE STATE OF COLORADO CONCERNING HOUSING UNIT CONSTRUCTION LIMITS, AND IN CONNECTION THEREWITH, REQUIRING EVERY COUNTY, CITY AND COUNTY, CITY, OR TOWN, WHETHER STATUTORY OR HOME RULE, TO LIMIT, BEGINNING IN 1999 AND IN EVERY YEAR THEREAFTER, THE NUMBER OF HOUSING UNITS APPROVED FOR CONSTRUCTION ANNUALLY SO THAT EACH OF THESE LOCAL GOVERNMENTS DOES NOT EXCEED THE PROJECTED NATIONAL GROWTH RATE IN HOUSEHOLDS FOR THAT YEAR; AL-

thereof.

LOWING SUCH LOCAL GOVERNMENTS TO ANNUALLY EXCEED THE PROJECTED NATIONAL GROWTH RATE IN HOUSEHOLDS BY TWO–TENTHS OF ONE PERCENT OR TWENTY FIVE HOUSING UNITS, WHICHEVER IS LARGER, IF SUCH EXCESS HOUSING UNITS ARE AFFORDABLE, LOW COST, OR SENIOR HOUSING; ALLOWING CHANGES IN GROWTH RATES AS WELL AS EXEMPTIONS FROM THE HOUSING UNIT CONSTRUCTION LIMITATION FOR SPECIFIC RESIDENTIAL DEVELOPMENTS OF A DEFINED NUMBER OF HOUSING UNITS UPON APPROVAL OF THE REGISTERED ELECTORS OF THE APPLICABLE LOCAL GOVERNMENT; AND, SPECIFYING ELECTION DATES FOR BALLOT ISSUES CONCERNING CHANGES IN GROWTH RATES AND EXEMPTIONS FROM THE HOUSING UNIT CONSTRUCTION LIMITS.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE CONSTITUTION OF THE STATE OF COLORADO CONCERNING HOUSING UNIT CONSTRUCTION LIMITS, AND IN CONNECTION THEREWITH, REQUIRING EVERY COUNTY, CITY AND COUNTY, CITY, OR TOWN, WHETHER STATUTORY OR HOME RULE, TO LIMIT, BEGINNING IN 1999 AND IN EVERY YEAR THEREAFTER, THE NUMBER OF HOUSING UNITS APPROVED FOR CONSTRUCTION ANNUALLY SO THAT EACH OF THESE LOCAL GOVERNMENTS DOES NOT EXCEED THE PROJECTED NATIONAL GROWTH RATE IN HOUSEHOLDS FOR THAT YEAR; ALLOWING SUCH LOCAL GOVERNMENTS TO ANNUALLY EXCEED THE PROJECTED NATIONAL GROWTH RATE IN HOUSEHOLDS BY TWO–TENTHS OF ONE PERCENT OR TWENTY FIVE HOUSING UNITS, WHICHEVER IS LARGER, IF SUCH EXCESS HOUSING UNITS ARE AFFORDABLE, LOW COST, OR SENIOR HOUSING; ALLOWING CHANGES IN GROWTH RATES AS WELL AS EXEMP-

TIONS FROM THE HOUSING UNIT CONSTRUCTION LIMITATION FOR SPECIFIC RESIDENTIAL DEVELOPMENTS OF A DEFINED NUMBER OF HOUSING UNITS UPON APPROVAL OF THE REGISTERED ELECTORS OF THE APPLICABLE LOCAL GOVERNMENT; AND, SPECIFYING ELECTION DATES FOR BALLOT ISSUES CONCERNING CHANGES IN GROWTH RATES AND EXEMPTIONS FROM THE HOUSING UNIT CONSTRUCTION LIMITS?

The summary prepared by the Board is as follows:

This measure requires that, beginning in 1999, counties, city and counties, cities, or towns, whether statutory or home rule, limit the number of housing units approved for construction annually so that each of these local governments does not exceed the projected national growth rate in households for that year, as determined by the United States Bureau of the Census and updated annually by the appropriate state agency. It allows these local governments to annually exceed the projected national growth rate in households by two-tenths of one percent or twenty five housing units, whichever is larger, if the excess housing units are affordable, low-cost, or senior housing. It allows for a change in the growth rate and the exemption from the housing unit construction limitation of specific residential developments of a defined number of housing units upon approval of the registered electors of the applicable local government, and specifies election dates for such ballot issues.

The cumulative fiscal impact of this measure on local governments is indeterminate. However, the measure may have a negative fiscal impact on those local governments that would otherwise realize greater revenues because of population growth.

The measure would have no direct fiscal impact on state government. However, a negative fiscal impact may result if, by restricting housing construction, the measure drives housing prices up and increases the

demand for state and local housing assistance and welfare programs.

7/16/97 Rehearing

Jerry G. Percy Motion denied in full

James C. Bailey Motion denied with exception of partial rewording of title, ballot title and submission clause

Adjourned 2:40 p.m.