In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1999–2000 # 255.

William Bernard Herpin, Jr., Petitioner,

v.

John F. Head and Arnold Grossman, Respondents,

and

William Hobbs, Alan Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title And Submission Clause, and Summary for 1999–2000 # 255.

Barry Wagoner, Petitioner,

v.

John F. Head and Arnold Grossman, Respondents,

and

William Hobbs, Alan Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause, and Summary for 1999–2000 # 255.

Ari Armstrong and Debra Collins, Petitioners,

v.

John F. Head and Arnold Grossman, Respondents,

and

William Hobbs, Alan Gilbert and Charles W. Pike, Title Board.

In the Matter of the Title, Ballot Title and Submission Clause, and Summary for 1999–2000 # 255.

Aimee Rathburn, Petitioner,

v.

John F. Head and Arnold Grossman, Respondents,

and

William Hobbs, Alan Gilbert and Charles W. Pike, Title Board.

Nos. 00SA147, 00SA151, 00SA152, 00SA166.

Supreme Court of Colorado,
En Banc.

July 3, 2000.

James O. Bardwell, Denver, Colorado, Attorney for Petitioner in No. 00SA147.

Hall & Evans, L.L.C., Alan Epstein, Hugo Teufel, Denver, Colorado, Attorneys for Petitioner in No. 00SA151.

Barry K. Arrington, Arrington & Rouse, P.C., Denver, Colorado, Attorney for Petitioners in No. 00SA166.

Paul Grant, Englewood, Colorado, Attorney for Petitioners in No. 00SA152.

Issacson, Rosenbaum, Woods & Levy, P.C., Mark G. Grueskin, Edward T. Ramey, Denver, Colorado, Attorneys for Respondents.

Ken Salazar, Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, Colorado, Attorneys for Title Board.

## PER CURIAM.

We have consolidated four ballot title review proceedings that all relate to a proposed initiative concerning background checks at gun shows. The petitioners are registered electors who brought these original proceedings pursuant to section 1–40–107(2), 1 C.R.S. (1999), to review the actions taken by the initiative title setting board (the "Board") in fixing the title, ballot title and submission clause ("titles"), and summary (collectively, "titles and summary")[1] for Initiative 1900–00 # 255 (the "Initiative").[2]

On March 24, 2000, the proponents of the Initiative, John F. Head and Arnold Grossman, filed a draft of the Initiative with the Secretary of State's Office. The Initiative proposed to add a new article 26.1 to title 12 of the Colorado Revised Statutes, consisting of sections 12–26.1–101 to –108. Proposed article 26.1 is entitled "Background Checks – Gun Shows." The Initiative was set on the Board's agenda for hearing on April 5, 2000. On April 5, over the objections of petitioners Barry Wagoner, Ari Armstrong, and Debra Collins, the Board set the Initiative's titles and summary. On April 10, the petitioner in No. 00SA147, William Bernard Herpin, filed a pro se motion for rehearing. Petitioner Wagoner (No. 00SA151), and petitioners Armstrong and Collins (No. 00SA152) filed motions for rehearing on April 12. The Board heard the motions for rehearing on April 19, 2000, and granted the motions in part and denied them in part. After the other petitioners had filed their petitions for review in this court, petitioner Aimee Rathburn (No. 00SA166) filed her motion for rehearing on April 26. The Board denied Rathburn's motion for rehearing on May 3, 2000, concluding that it did not have jurisdiction to hear the motion, but, in the alternative, if it did have jurisdiction, it denied the motion on the merits.

These four review proceedings raise numerous procedural and substantive issues. The issues can be grouped in four main categories: procedural issues relating to the Board's jurisdiction to set and amend the titles and summary; whether the Initiative contains a single subject; whether the titles and summary that the Board has set reflect the true intent of the Initiative or whether it is misleading; and whether the fiscal impact statement contained in the summary is adequate. We conclude that the Board had jurisdiction to set the titles and summary and

---

1. The Board's titles and summary for the Initiative are attached as Appendix A to this opinion.

2. The text of proposed initiative 1999–00 # 255 is attached as Appendix B.

to correct two clerical mistakes; the Initiative contains but a single subject; the titles and summary are not misleading; and the fiscal impact statement is adequate. The final issue is whether the Board had jurisdiction to consider Rathburn's motion for rehearing. We conclude that it did not.

## I. Procedural Issues

### A. The Noon Deadline

■ Petitioner Wagoner and petitioners Armstrong and Collins assert that section 1–40–106(3)(a), 1 C.R.S. (1999), precluded the Board from setting the titles and summary at its April 5, 2000, meeting because the office of state planning and budgeting (OSPB) did not file its fiscal impact statement by noon on the Friday before the meeting. Wagoner asserts that the evidence at the hearing revealed that the OSPB submitted two versions of its report regarding fiscal information on Friday, March 31, after the noon deadline; one apparently at 12:05 p.m., and the other, a replacement report that corrected a calculation error in the previous version, at about 3:15 p.m. The petitioners claim that under the plain language of section 1–40–106(3)(a), the Board could not hold a hearing on the Initiative until its next meeting, Wednesday, April 19, 2000.

The petitioners therefore read the Friday noon deadline as jurisdictional. At all times relevant to this proceeding,[3] section 1–40–106(3)(a), 1 C.R.S. (1999), provided:

(3)(a) The title board shall prepare a clear, concise summary of the proposed law or constitutional amendment. The summary shall be true and impartial and shall not be an argument, nor likely to create prejudice, either for or against the measure. The title board may request assistance in the preparation of the summary from the legislative council and, if, in the opinion of the title board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdivisions, shall request assistance in such matter from the office of state planning and budgeting or the department of local affairs. *When the title board requests fiscal impact information from the office of state planning and budgeting or the department of local affairs, the fiscal impact information shall be filed with the secretary of state by 12 noon on the Friday before the meeting of the title board at which the draft is to be considered.* The legislative council, the office of state planning and budgeting, and the department of local affairs shall furnish any assistance requested, and the summary shall include an estimate of any such fiscal impact, together with an explanation thereof.

(emphasis added.) The petitioners also assert that former section 1–40–106(3)(a) must be read "in pari materia" with section 1–40–106(1), which contains similar filing deadline language. Section 1–40–106(1), 1 C.R.S. (1999) provides:

(1) For ballot issues, beginning with the first submission of a draft after an election, the secretary of state shall convene a title board consisting of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. The title board, by majority vote, shall proceed to designate and fix a proper fair title for each proposed law or constitutional amendment, together with a submission clause, at public meetings to be held at 2 p.m. on the first and third Wednesdays of each month in which a draft or a motion for reconsideration has been submitted to the secretary of state. *To be considered at such meeting, a draft shall be submitted to the secretary of state no later than 3 p.m. on the twelfth day before the meeting at which the draft is to be considered by the title board.* The first meeting of the title board shall be held no sooner than the first Wednesday in December after an election, and the last meeting shall be held no later than the third Wednesday in May in the year in which the measure is to be voted on.

**3.** After the titles and summary were set in this case, the general assembly repealed the requirement that the Board set a summary, including the fiscal impact statement. *See* ch. 339, sec. 1, § 1–40–106, 2000 Colo. Sess. Laws ___, ___.

(emphasis added.) Without citing any authority, Wagoner asserts that section 1–40–106(1) has been held to be jurisdictional. *Cf. In re Proposed Initiated Constitutional Amend. Concerning The "Fair Treatment II",* 877 P.2d 329, 333 (Colo.1994) (holding that the twelve-day notice requirement of section 1–40–106(1) refers to a draft of the text of the proposed measure, not the titles and summary; section 106(1) was not violated when the proponents submitted a proposed amendment to the titles and summary on the day of the hearing).

■ The respective deadlines contained in sections 1–40–106(1) and 1–40–106(3)(a) must be viewed in the context of the people's fundamental constitutional right of initiative. "The right of initiative and referendum, like the right to vote, is a fundamental right under the Colorado Constitution." *Loonan v. Woodley,* 882 P.2d 1380, 1383 (Colo.1994). We have held that the "constitutional and statutory provisions governing the initiative process should be liberally construed so that the constitutional right reserved to the people 'may be facilitated and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.'" *Fabec v. Beck,* 922 P.2d 330, 341 (Colo.1996) (quoting *Loonan,* 882 P.2d at 1384; some internal quotation marks omitted). Unlike the twelfth-day deadline contained in section 1–40–106(1), which is entirely within the power of the proponents themselves to meet, the noon Friday deadline is the responsibility of the staff of the OSPB and department of local affairs ("DOLA"). If section 1–40–106(3)(a) were considered jurisdictional, the staff of a government agency would have the power to delay progress on an initiative simply by retaining the requested fiscal information until a few minutes after noon on the Friday before the scheduled hearing. This would be inconsistent with the exercise of the constitutional right of the initiative.

■ We approved a departure from the timeline established for the submission of fiscal impact information in *In re Second Initiated Constitutional Amendment Re-*

*specting the Rights of the Public to Uninterrupted Service by Public Employees of 1980,* 200 Colo. 141, 145, 613 P.2d 867, 869–70 (1980). In that case, the Board was considering the proposed initiative on the last day for hearings provided by statute when it realized it had not requested fiscal impact information. The Board continued the hearing to the next day on the request of one of the proponents, considered the comments of the DOLA, and fixed the summary the day after the statutory deadline. We held that the Board substantially complied with the statute:

> The purpose of the statutory time table for meetings of the Board is to assure that the titles, submission clause, and summary of an initiated measure are considered promptly by the Board well in advance of the date by which the signed petitions must be filed with the Secretary of State. Here, the hearing was begun and substantially completed on the statutorily required date. A continuance to the next day in order to comply fully with other statutory requirements does not frustrate the purpose of the statute. *We believe that to invalidate this initiative on the basis of such minimal delay would be contrary to the spirit of the Colorado Constitution providing the right of initiative. The Colorado Constitution, as well as the statutes which implement it, must be liberally construed so as not to unduly limit or curtail the initiative rights of the people.*

*Id.* at 145–46, 613 P.2d at 870 (emphasis added; footnotes omitted). We therefore agreed with the Board and the proponents that substantial compliance is the standard by which to judge compliance with section 1–40–106(3)(a):

> In determining whether initiative proponents have achieved substantial compliance, we must consider (1) the extent of noncompliance, (2) the purpose of the applicable provision and whether that purpose is substantially achieved despite the alleged noncompliance, and (3) whether there was a good-faith effort to comply or whether noncompliance is based on a conscious decision to mislead the electorate.

*Fabec,* 922 P.2d at 341; *see also In re Proposed Initiated Constitutional Amend. "1996–3",* 917 P.2d 1274, 1276 (Colo.1996). In this case, any noncompliance was minimal. The first letter from the OSPB arrived just five minutes past noon. The purposes of the statute were substantially achieved; the Board received and was able to consider the OSPB's fiscal information sufficiently in advance of the hearing for the information to be used. None of the petitioners have alleged that they were injured in any way by the delay, nor could they. Wagoner was certainly not prejudiced because he had the opportunity to challenge the sufficiency of the fiscal impact statement at the April 19 rehearing, and the Board changed the fiscal impact statement in response to his objections.

 Finally, there was no evidence of any intent to mislead any voter. The OSPB's good faith was demonstrated by the time that the first letter was received, which was only five minutes past noon, and by the agency's concern about correcting the first version, resulting in the second transmission at about 3:15 or 3:25 p.m. To invalidate the Board's actions because of such a minor, technical violation of the statute would impermissibly infringe on the fundamental right of initiative. Accordingly, we conclude that there was substantial compliance in this case, and the Board had the power to set the titles and summary at the April 5 hearing.[4]

### B. The Correction of the Summary

 On May 11, 2000, the Board filed a corrected summary with this court. The corrected summary removed two transcription errors. First, it deleted the word "equal" between the word "full" and "implementation" in the eighth paragraph of the summary. The second correction occurred in the summary's second to last paragraph; the Board deleted the word "the" between "for" and "continuation." Wagoner asserts that these changes were void because the Board lost jurisdiction when the petitioners filed their petitions for review. Citing *Colorado State Board of Medical Examiners v. Lopez–Samayoa,* 887 P.2d 8, 14 (Colo.1994), Wagoner claims that it is a well-settled principle of administrative law that the filing of a notice of appeal for judicial review divests an agency of jurisdiction over a matter. However, *Lopez–Samayoa* recognizes an exception to the general rule that a notice of appeal divests a lower court of jurisdiction where "the proceedings do not involve a challenge to the propriety of the judgment." *Id.* at 15. The May 11 changes were purely clerical corrections. We note that C.R.C.P. 60(a) provides:

> (a) **Clerical Mistakes.** Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. *During the pendency of an appeal such mistakes may be so corrected before the case is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.*

(emphasis added.) While C.R.C.P. 60(a) does not apply directly to proceedings before the Board, we believe that the same principle is involved. "As long as the appellate court has not expressly or implicitly ruled on the

---

4. Wagoner claims that in the past the Board concluded that it could not set titles because the OSPB or the DOLA did not submit their reports on time. He has attached a transcript of a hearing on a proposed measure before the Board on April 1, 1998, in which he asserts that this occurred. According to Wagoner, the Board's failure to follow its own precedent was arbitrary and capricious. However, the Board was not bound by its previous decisions regarding jurisdiction. The provisions of the Administrative Procedure Act do not apply to the Board. *See In re Proposed Amend. Entitled "W.A.T.E.R.",* 831 P.2d 1301, 1305–06 (Colo.1992). There is there-

fore no reason why the Board, like a court, could not correct its own practice.

Wagoner also argues that because the statutory provision originally contained no noon deadline, but then was amended to provide such a deadline, this indicates the general assembly's intent to make the deadline jurisdictional. But this argument proves too much. The statute has recently been amended to delete the requirement of a fiscal impact statement altogether, including any deadline. Under Wagoner's reasoning, this would prove that the deadline was *not* jurisdictional.

issue, the district court has not transgressed any jurisdictional boundaries by amending [a judgement to correct a clerical mistake under Fed.R.Civ.P. 60(a) ] after an appeal has been taken." *Panama Processes, S.A. v. Cities Serv. Co.,* 789 F.2d 991, 994 (2d Cir.1986). The petitioners do not allege that the Board's May 11 submission did anything other than correct two clerical mistakes. We conclude that the Board did not intrude on our jurisdiction when it made the corrections. We therefore reject the petitioner's contention.

### C. Rathburn's Motion for Rehearing

 Following the April 19 rehearing, the Board reset the titles and summary to reflect the one-time cost of a web-based computer interface and to indicate that state and local costs for law enforcement and incarceration were indeterminate. Rathburn filed a motion for rehearing on April 26, asserting that: the Board should not have amended the summary to include the web-based interface cost and to state that law enforcement costs were indeterminate. According to Rathburn's motion, the Board should have asked for further financial information from the OSPB and DOLA before concluding that the cost was indeterminate. In addition, the Board should have checked with the department of public safety and the Colorado Bureau of Investigation ("CBI") to determine whether the web-based computer interface would be appropriate and necessary to carry out the Initiative's purposes. The Board heard Rathburn's motion for rehearing on May 3, 2000, and denied it on the grounds that it was without jurisdiction to hear it and that, even if it had jurisdiction, the motion would be denied on its merits.

 The Board points out that some of the petitioners had filed their petitions for review in this court by April 25, the day before Rathburn's motion for rehearing, and

thus the Board did not have jurisdiction to hear the motion.[5] We agree with the Board that, once the petitioners had filed their petitions for review with this court, the Board lost jurisdiction to make substantive changes to the titles and summary. *See Lopez–Samayoa,* 887 P.2d at 14–15. Rathburn's motion for rehearing raised issues regarding the fiscal impact statement that other petitioners have raised in these review proceedings. Thus, granting Rathburn's motion for rehearing would have required the Board to make substantive changes to the summary after the case was in this court. This would impermissibly intrude on our jurisdiction over the case. The Board properly refused to consider Rathburn's motion for rehearing.[6] We will therefore not consider Rathburn's substantive objections to the summary.

### II. Single–Subject Requirement

 Petitioner Herpin and petitioners Armstrong and Collins allege that the Board should not have set the titles and summary because the Initiative contains multiple subjects, which is prohibited by the Colorado Constitution. Article V, section 1(5.5) states:

No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

Colo. Const. art. V, § 1(5.5); *see also* 1–40–106.5, 1 C.R.S. (1999) (addressing the constitutional single-subject requirement). In *In*

---

5. Our records indicate that the petition for review in No. 00SA147 (Herpin) was filed on April 24; in No. 00SA151 (Wagoner) on April 25, and in No. 00SA152 (Armstrong and Collins) on April 26.

6. This resolution makes it unnecessary for us to address the issue we left open in *In re 1999–2000 No. 219,* 999 P.2d 819, 821–22 (Colo.2000). In that case, we held that section 1–40–107 permit-

ted an objector to bring only one motion for a rehearing to challenge the titles set by the Board. We did not address the situation where the objector files a second motion for rehearing to challenge the reset titles. *See id.* When the objector filed his motion for rehearing, no petition for review was pending, and thus that case did not present the jurisdictional issue involved in this case.

*re Proposed Initiative for 1999–2000 # 25,* 974 P.2d 458, 460–63 (Colo.1999), we explained the origins and history of the single-subject requirement. A proposed initiative violates this requirement when it "relate[s] to more than one subject and ... has at least two distinct and separate purposes which are not dependent upon or connected with each other." *In re Proposed Initiative "Public Rights In Waters II",* 898 P.2d 1076, 1078–79 (Colo.1995). However, a proposed measure that "tends to effect or to carry out one general objective or purpose presents only one subject." *In re 1999–2000 # 25,* 974 P.2d at 463. The proposed measure in this case easily passes these tests, and contains only a single subject.

■ We agree with the proponents that the Initiative's single subject is the implementation of background checks at gun shows. To achieve this end, the Initiative requires background checks as a condition to transfer a firearm at a gun show; provides that a licensed gun dealer request that such checks be conducted by the CBI; authorizes the licensed gun dealer to charge a maximum fee so that she can be compensated for requesting the check; requires that the licensed gun dealer keep records of the checks made; sets forth notice requirements to be posted at gun shows; defines some of the terms involved in the measure; imposes penalties for violations of the measure; and requires that the general assembly makes funds available for the measure to be implemented. The mere fact that the Initiative contains detailed provisions for its implementation does not mean that it contains multiple subjects. "An initiative with a single, distinct purpose does not violate the single-subject requirement simply because it spells out details relating to its implementation. As long as the procedures specified have a necessary and proper relationship to the substance of the initiative, they are not a separate subject." *In re 1997–1998 No. 74,* 962 P.2d 927, 929 (Colo.1998).

■ We will examine the petitioners' objections in order. Herpin asserts that the Initiative will in fact ban gun sales by unlicensed persons at gun shows altogether. According to Herpin, federal law requires persons engaged in the business of selling firearms to obtain a federal firearms license, and to obtain government approval prior to transfer. The Initiative requires that background checks be performed by the CBI, who will contact the National Instant Criminal Background Check System. Herpin points out that persons not engaged in the business of selling firearms are excluded from federal licensing and background check requirements. The Initiative also requires a licensed gun dealer to be present at the gun show and to request the background check for an unlicensed person who is transferring the firearm, but Herpin claims that this is prohibited by federal law. He asserts that no licensed gun dealer will risk violating federal law, and thus no such transfers will occur.

■ The limited nature of our review prevents us from reaching this contention, however. In determining whether a proposed measure contains more than one subject, we may not interpret its language or predict its application if it is adopted. *See In re 1997–98 # 64,* 960 P.2d 1192, 1197 (Colo. 1998); *cf. In re Branch Banking Initiative,* 200 Colo. 85, 90, 612 P.2d 96, 99 (1980) (upholding Board's decision not to include the proposed initiative's possible conflict with federal banking law).

■ Herpin's second argument is that, because of its mandatory appropriation provision, the Initiative cuts state spending in other, unspecified areas, and that this has been held to be a second, unrelated subject. Specifically, he relies on our decision in *In re 1997–98 No. 84,* 961 P.2d 456, 460 (Colo. 1998), where we said:

> Initiative # 84 and Initiative # 85 still contain more than one subject. First, the initiatives provide for tax cuts. Second, the initiatives impose mandatory reductions in state spending on state programs. These two subjects are distinct and have separate purposes. While requiring the state to replace affected local revenue in itself sufficiently relates to a tax cut, requiring the state separately to reduce its spending on state programs is not "dependent upon and clearly related" to the tax cut.

*In re 1997–98 No. 84* is distinguishable, however. The two subjects there were (1) tax cuts and (2) reductions in state spending that were unrelated to the tax cuts. *See id.* In this case, the appropriations are directly related to the purpose of the Initiative, because, without it, the CBI and other agencies may not conduct the background checks. In addition, as the proponents point out, the requirement that the general assembly appropriate funds for the implementation of the Initiative does not mandate reduction of funding for any other state program.

■ Petitioners Armstrong and Collins contend that the requirements involving the licensed gun dealers may be illegal, and that this somehow creates a second subject. We rejected this argument above. They also claim that the Initiative's limit on the fee that licensed gun dealers may charge for a background check may conflict with federal law. This leads them to conclude that because the Initiative "deals with matters that appear in Colorado and federal statutes, as well as the Code of Federal regulations" it involves more than one subject. According to Armstrong and Collins, the limit on background fees "cannot have any necessary connection to an initiative seeking to 'close the loophole' on private sales."

■ However, the fact that the provisions of a measure may affect more than one other statutory provision does not itself mean that the measure contains multiple subjects. The Initiative authorizes a licensed gun dealer who conducts a background check at a gun show to charge a fee for her services. Allowing persons to charge such a fee relates directly to making such background checks practical and more likely that they will be performed. It is not a second unconnected subject. We conclude, as did the Board, that the Initiative contains a single subject.

### III. Titles and Summary

■ The petitioners allege that the titles and the summary are misleading and do not correctly and fairly express the Initiative's true intent and meaning. Section 1-40–106(3)(b), 1 C.R.S. (1999) provides:

(b) In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *The title for the proposed law or constitutional amendment, which shall correctly and fairly express the true intent and meaning thereof,* together with the ballot title, submission clause, and summary, shall be completed within two weeks after the first meeting of the title board.... *Ballot titles shall be brief,* shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

(emphasis added.) The standards that we use when we review the titles and summary are well settled. As we said in *In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d 1127 (Colo.1996), " In reviewing the actions of the Board, we grant 'great deference to the board's broad discretion in the exercise of its drafting authority.' " *Id.* at 1131. (quoting *In re Proposed Initiative Concerning "State Personnel Sys.",* 691 P.2d 1121, 1125 (Colo.1984)). It is not our function to rewrite the titles and summary to achieve the best possible statement of the proposed measure's intent. *See In re Mineral Prod. Tax Initiative,* 644 P.2d 20, 25 (Colo.1982). We will reverse the Board's action in setting the titles only when the language chosen is clearly misleading. *See In re "State Personnel Sys.",* 691 P.2d at 1125. Moreover, the summary is "not intended to fully educate people on all aspects of the proposed law, and it need not set out in detail every aspect of the initiative." *In re Proposed Initiative Under the Designation "Tax Reform",* 797 P.2d 1283, 1289 (Colo. 1990).

All of the petitioners claim that the Board's titles and summary are misleading for many reasons. In an attempt to make

the petitioners' objections and our analysis understandable, we address their objections in order.

## A. Herpin

■■■■ Herpin first claims that the titles do not reflect the true intent of the Initiative because they do not define "gun show." According to Herpin, this was error because "gun show" as it is used in the Initiative is broader (it "encompasses virtually any place where firearms transactions might occur") than its traditional meaning ("events put on by promoters who charge both an admission fee and a fee to persons selling firearms"). The summary contains a definition of "gun show," however. The titles are not required to include definitions of terms unless the terms "adopt a new or controversial legal standard which would be of significance to all concerned" with the Initiative. *In re Proposed Election Reform Amend.*, 852 P.2d 28, 34 (Colo.1993). Section 1–40–106(3)(b) requires ballot titles to be brief. The Board was within its discretion when it defined "gun show" in the summary but not the titles.

■■■■ In his answer brief, Herpin also alleges that the definition of "gun show vendor" in the titles and summary is incomplete and omits parts of the definition found in the Initiative. The titles and summary define "a 'gun show vendor' as any person who exhibits, offers for sale, or transfers a firearm at a gun show." Section 12–26.1–106(5) of the Initiative states: " 'Gun show vendor' means any person who exhibits, sells, offers for sale, transfers, or exchanges, any firearm at a gun show, regardless of whether the person arranges with a gun show promoter for a fixed location from which to exhibit, sell, offer for sale, transfer, or exchange any firearm." In order to satisfy the requirement of brevity, the Board condensed the definition of "gun show vendor" in the titles. The definition they retained is not clearly misleading and thus was within their discretion in setting the titles. *See In re "State Personnel Sys."*, 691 P.2d at 1125.

■■■■ Herpin also complains that the titles and summary are misleading because they do not define "firearm," although, in his view, the Initiative defines the term in the broadest possible way. He asserts that while the Initiative excludes antique firearms from background checks, these firearms would still be used to define a gun show.

The proponents contend that "firearm" is not a new or technical term. They also point out that the definition of "firearm" is taken verbatim from section 18–1–901(3)(h), 6 C.R.S. (1997) (provisions applicable to offenses generally). In response, Herpin points out that "firearm" is defined in two additional provisions of the state statutes: section 12–26–101(1)(a), 4 C.R.S. (1999) (regulating firearms dealers), and section 30–15–301(1), 9 C.R.S. (1999) (prohibiting the discharge of firearms in unincorporated areas). The three definitions are similar, however. In this case, the Board was within its discretion when it declined to define "firearm" in the titles and summary.

■■■■ Herpin's next objection is that nothing in the titles and summary mentions that the Initiative requires a background check on sales of firearms by unlicensed persons to licensed gun dealers, which is the opposite of current federal law. This misconceives the purpose of the titles and summary. The titles and summary are intended to alert the electorate to the salient characteristics of the proposed measure. They are not intended to address every conceivable hypothetical effect the Initiative may have if adopted by the electorate. *See Tax Reform*, 797 P.2d at 1289. As the proponents point out, the shorter version in the titles is adequate because (1) the commonly understood meaning of "transfers" includes both "sells" and "exchanges," and the summary includes both "sells" and "exchanges" in the definition of gun show vendor; and (2) the omission of "fixed location" from the definition in the titles and summary is unnecessary – the titles and summary reflect the "essential concept." *Cf. In re Proposed Initiative on Water Rights*, 877 P.2d 321, 327 (Colo.1994) (omission of "strong" from "strong public trust doctrine" in titles although phrase was contained in initiative itself was not error; the term was not defined in the initiative and

voters would be informed of the "essential concept" of the proposed amendment).

### B. Wagoner

 Wagoner claims that the titles and summary fail to adequately and fairly state the true intent of the Initiative, which, according to him, is to regulate noncommercial firearm sales. "In reading the proposed initiative in pari materia with state and federal laws covering the same subject matter, the true intent of the proposed initiative [to regulate noncommercial sales] is readily apparent." Wagoner asserts that the titles and summary should reflect this. Further, the "ballot language is false and misleading because it erroneously presents that there are currently no background checks conducted at gun shows."

However, as the proponents indicate, the titles and summary state that the background check applies to all "prospective transferees if any part of the transaction occurs at a gun show." The Initiative states, "If any part of a firearm transaction takes place at a gun show, no firearm shall be transferred unless a background check has been obtained by a licensed gun dealer." § 12–26.1–101(3). The titles and summary therefore track the Initiative; all sales—commercial and noncommercial—are included in the Initiative's sweep. Thus, the titles are not misleading. Nor are they misleading because they do not refer to the Initiative's possible interplay with existing state and federal laws. *See In re Branch Banking Initiative*, 200 Colo. at 90, 612 P.2d at 99 (upholding Board's decision not to include the proposed initiative's possible conflict with federal banking law).

### C. Armstrong and Collins

 Armstrong and Collins list a number of terms they say should either have been defined in the titles and summary, or are defined wrongly in the titles. The first is "gun show vendor," which we have already held was not defined misleadingly in the titles and summary.

They also object that the titles and summary do not define "gun show promoter." They claim that the commonsense meaning of "promoter" conflicts with the definition in the Initiative since a promoter would not automatically include a person who manages or operates an event. We disagree. The titles and summary outline the promoter's responsibilities under the Initiative—to arrange for the presence of a licensed gun dealer and to post notice of the background check requirement. This was sufficient.

 Armstrong and Collins next challenge the Board's decisions not to define "background check" and "prospective firearms transferees," neither of which is defined in the Initiative. However, the Board is not usually required to define a term that is undefined in the proposed measure. *See In re Proposed Initiative "1996–6"*, 917 P.2d 1277, 1281–82 (Colo.1996) ("We held that the phrase 'strong public trust doctrine' need not be defined in the title or submission clause since it was undefined in the initiative itself, *In re Proposed Initiative on Water Rights*, 877 P.2d at 327, just as 'public trust doctrine' is not defined in the present Initiative. However, while the Board could have stated that the phrase was undefined, its failure to do so is not fatal."); *In re Proposed Initiative on Water Rights*, 877 P.2d at 327 (omitting "strong" from "strong public trust doctrine" in titles was not error even though phrase was contained in the initiative itself; the term was not defined in the initiative and voters would be informed of the "essential concept" of the proposed amendment).

According to the petitioners, "prospective firearms transferees" is not a term of everyday usage, and is not easily understood except by lawyers. But, as the respondents point out, it is drawn directly from the Initiative, which does not further define the term. *See In re Proposed Initiative on Water Rights*, 877 P.2d at 327. It was not error to not define the term in the titles.

 Armstrong and Collins contend that the titles hide the fact that licensed gun dealers who obtain the background checks will be required to keep records of the checks, and that this results from the Board's failure to refer to other state statutes in the titles and summary that contain the record-keeping requirements. However, the Board

is not required to explain the relationship between the Initiative and other statutes or constitutional provisions. *See In re Proposed Ballot Initiative on Parental Rights,* 913 P.2d at 1132.

■ Finally, the petitioners allege that the titles are confusing because they state that the Initiative would prohibit transfer of a firearm if a background check has not been obtained by a licensed gun dealer, when, in fact, the measure would prohibit such a transfer if the background check was not obtained *and* the CBI did not approve the transfer. As we have stressed above, the General Assembly has directed that the titles be brief. The titles and summary are not required to address every provision of a proposed measure. In this case, however, any ambiguity is cured by the summary, which states: "The measure provides that a gun show vendor, prior to the transfer or attempted transfer of a firearm at a gun show, shall require a background check on the prospective transferee *and approval of the transfer from the Colorado Bureau of Investigation.*" (emphasis added.) The Board was well within its discretion when it chose to place the requirement of CBI approval in the summary rather than the titles.

### IV. Fiscal Impact Statement

■ The final issue we must address is whether the fiscal impact information in the Board's summary is adequate. Petitioner Wagoner and petitioners Armstrong and Collins claim that it is not. They all assert that the Board erred when it stated that some costs were indeterminate, rather than obtaining specific fiscal information from the OSPB and the DOLA. The challenged part of the fiscal impact statement in the summary states: "In addition to these costs, it is likely that there would be state and local costs for law enforcement and incarceration, but the amount of such costs is indeterminate."

■ We described the purposes of the fiscal impact statement in *In re Petition on School Finance,* 875 P.2d 207, 211–12 (Colo. 1994):

> The purpose of including a fiscal impact statement in the summary is to inform the

electorate of the fiscal implications of the proposed measure. The Board has discretion in exercising its judgment regarding how to best communicate that a proposed measure will have a fiscal impact on government without creating prejudice for or against the proposed measure. A separate explanation of the fiscal impact of a measure is not required when the fiscal impact cannot be determined due to the variables involved.

(citations omitted); *see also In re Proposed Initiated Constitutional Amend. Concerning Unsafe Workplace Env't,* 830 P.2d 1031, 1035 (Colo.1992) ("[A] definitive fiscal impact statement is not required where, due to the variables or uncertainties inherent in the particular issue, the fiscal impact cannot reasonably be determined from the materials submitted to the Board.").

■ In this case, the petitioners did not provide any fiscal data to the Board indicating how many violations of the Initiative could be expected, or an estimate of law enforcement costs associated with the Initiative, other than an estimate of the daily cost of housing an offender. On the other hand, Wagoner himself introduced evidence at the hearing that the costs of law enforcement would be indeterminate. He presented "The State Conditional Fiscal Impact for S.C.R. 00–009" (which he asserts was substantially similar to the Initiative) to the Board. This document was prepared by the Legislative Council Staff, and it states at page 3:

> If approved by the voters, the bill will create a class 1 misdemeanor and would have a fiscal impact on local government due to the possible increase in county court filings for misdemeanor offenses and the associated county jail sentences. According to a 1993 report from the State Auditor's Office, the average daily cost to house an offender in a county jail is $54. *Because the sentencing court has the discretion to impose a fine, a jail sentence, or both, the impact upon local governments is unknown at this time.*

(emphasis added.) Thus, Wagoner's own evidence established that the Board was well within its discretion to conclude that the law enforcement costs of the Initiative were inde-

terminate. The Board is not limited by the estimates provided by the OSPB and the DOLA; it can look at all of the evidence of costs before it. *See In re No. 25A Concerning Housing Unit Constr. Limits,* 954 P.2d 1063, 1066 (Colo.1998) ("However, section 1–40–106(3)(a) does not limit the Board to information submitted by the department of local affairs or the office of state planning and budgeting in formulating a fiscal impact statement."). We conclude that the Board properly found law enforcement costs were indeterminate because of the variables and uncertainties involved. *See In re Casino Gaming Initiative,* 649 P.2d 303, 307 (Colo. 1982) (declining to require the Board to request cost estimates from local officials, including law enforcement officials, on the costs of gaming in certain counties since "responses from county officials would not eliminate the variables which made the fiscal impact indeterminate.").[7]

■ Wagoner also states that the Legislative Council Staff's cost estimates for S.C.R. 00–009 were different from the OSPB's estimates. In response, the Board took the information in relation to a web-based computer site and added it to the OSPB's estimates. Wagoner claims that the Board should have either listed the two alternative estimates or requested more analysis from OSPB to reconcile the differences.

■ First, the Board is not required to accept at face value the information provided to it. *See In re Proposed Initiative "1997–98 # 10",* 943 P.2d 897, 900 (Colo.1997). Second, the Board could have properly concluded there would be no point in asking the OSPB to reconcile the two estimates because the OSPB had already compared the two projections, and the deputy director of the OSPB stated at the April 19 rehearing that its cost estimates would not be revised even given the Legislative Council's estimate.

■ Finally, Armstrong and Collins complain about information submitted for the first time at the rehearing from the deputy director of the OSPB and a representative of the department of public safety. But the Board may take evidence at the hearing from any interested party, not just the objectors. There was no error. We conclude that the fiscal impact statement contained in the Board's summary was adequate.

### V.

Accordingly, we affirm the action of the board in setting the titles and summary. In No. 00SA166, we affirm the action of the Board in denying petitioner Rathburn's motion for rehearing.

### APPENDIX A

### Ballot Title Setting Board

*Proposed Initiative "1999–2000 # 255"*[1]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING A REQUIREMENT THAT BACKGROUND CHECKS BE CONDUCTED ON PROSPECTIVE FIREARMS TRANSFEREES IF ANY PART OF THE TRANSACTION OCCURS AT A GUN SHOW, AND IN CONNECTION THEREWITH, DIRECTING THAT A GUN SHOW VENDOR REQUIRE A BACKGROUND CHECK ON A PROSPECTIVE TRANSFEREE AND OBTAIN APPROVAL OF THE TRANSFER FROM THE COLORADO BUREAU OF INVESTIGATION; DEFINING A "GUN SHOW VENDOR" AS ANY PERSON WHO EXHIBITS, OFFERS FOR SALE, OR TRANSFERS A FIREARM AT A GUN SHOW; REQUIRING GUN SHOW PROMOTERS TO ARRANGE FOR THE SERVICES OF FEDERALLY LICENSED

---

7. Wagoner claims that paragraph 7 of the summary contradicts its last paragraph. Paragraph 7 states, "The Department of Local Affairs has determined that there would be no fiscal impact on local governments in Colorado resulting from implementation of the measure." The last paragraph indicates that the Board believes that "it is likely that there would be state and local costs for law enforcement and incarceration, but the

amount of such costs is indeterminate." These statements do not contradict one another. Paragraph 7 reflects DOLA's position; the last paragraph is the Board's view of law enforcement costs.

1. Background Checks—Gun Shows

GUN DEALERS TO OBTAIN BACK-GROUND CHECKS AT GUN SHOWS; PROHIBITING THE TRANSFER OF A FIREARM IF A BACKGROUND CHECK HAS NOT BEEN OBTAINED BY A FEDERALLY LICENSED GUN DEALER; REQUIRING RECORD KEEPING AND RETENTION BY FEDERALLY LICENSED GUN DEALERS WHO OBTAIN BACKGROUND CHECKS; PERMITTING FEDERALLY LICENSED GUN DEALERS TO CHARGE A FEE OF UP TO TEN DOLLARS FOR CONDUCTING EACH BACKGROUND CHECK AT GUN SHOWS; REQUIRING GUN SHOW PROMOTERS TO PROMINENTLY POST NOTICE OF THE BACKGROUND CHECK REQUIREMENT; ESTABLISHING CRIMINAL PENALTIES FOR VIOLATIONS OF THESE REQUIREMENTS; EXEMPTING TRANSFERS OF CERTAIN ANTIQUE FIREARMS, RELICS, AND CURIOS FROM THE BACKGROUND CHECK REQUIREMENT; AND REQUIRING THE APPROPRIATION OF FUNDS NECESSARY TO IMPLEMENT THE MEASURE.

The ballot title and submission clause as designated and fixed by the board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING A REQUIREMENT THAT BACKGROUND CHECKS BE CONDUCTED ON PROSPECTIVE FIREARMS TRANSFEREES IF ANY PART OF THE TRANSACTION OCCURS AT A GUN SHOW, AND IN CONNECTION THEREWITH, DIRECTING THAT A GUN SHOW VENDOR REQUIRE A BACKGROUND CHECK ON A PROSPECTIVE TRANSFEREE AND OBTAIN APPROVAL OF THE TRANSFER FROM THE COLORADO BUREAU OF INVESTIGATION; DEFINING A "GUN SHOW VENDOR" AS ANY PERSON WHO EXHIBITS, OFFERS FOR SALE, OR TRANSFERS A FIREARM AT A GUN SHOW; REQUIRING GUN SHOW PROMOTERS TO ARRANGE FOR THE SERVICES OF FEDERALLY LICENSED GUN DEALERS TO OBTAIN BACKGROUND CHECKS AT GUN SHOWS; PROHIBITING THE TRANSFER OF A FIREARM IF A BACKGROUND CHECK HAS NOT BEEN OBTAINED BY A FEDERALLY LICENSED GUN DEALER; REQUIRING RECORD KEEPING AND RETENTION BY FEDERALLY LICENSED GUN DEALERS WHO OBTAIN BACKGROUND CHECKS; PERMITTING FEDERALLY LICENSED GUN DEALERS TO CHARGE A FEE OF UP TO TEN DOLLARS FOR CONDUCTING EACH BACKGROUND CHECK AT GUN SHOWS; REQUIRING GUN SHOW PROMOTERS TO PROMINENTLY POST NOTICE OF THE BACKGROUND CHECK REQUIREMENT; ESTABLISHING CRIMINAL PENALTIES FOR VIOLATIONS OF THESE REQUIREMENTS; EXEMPTING TRANSFERS OF CERTAIN ANTIQUE FIREARMS, RELICS, AND CURIOS FROM THE BACKGROUND CHECK REQUIREMENT; AND REQUIRING THE APPROPRIATION OF FUNDS NECESSARY TO IMPLEMENT THE MEASURE?

The summary prepared by the Board is as follows:

This measure creates a new article to title 12, Colorado Revised Statutes, regarding requirements for criminal background checks of prospective firearms transferees at gun shows. The measure defines "gun show" to mean the entire premises at which (a) 25 or more firearms are offered or exhibited for sale, transfer, or exchange; or (b) not less than three gun show vendors exhibit, sell, offer for sale, transfer, or exchange firearms.

The measure provides that a gun show vendor, prior to the transfer or attempted transfer of a firearm at a gun show, shall require a background check on the prospective transferee and approval of the transfer from the Colorado Bureau of Investigation. The measure requires a gun show promoter to arrange for the services of one or more federally licensed gun dealers to obtain background checks at a gun show. The measure prohibits the transfer of a firearm, if any part of the transaction occurred at a gun shoe, where a background check has not been obtained by a federally licensed gun

dealer. The measure makes it a class 1 misdemeanor for a person to violate these provisions.

The measure requires record keeping by a federally licensed gun dealer and retention of such records, and makes it a class 1 misdemeanor to give false information in connection with the making of such records. The measure permits a federally licensed gun dealer to charge a fee not to exceed $10 for conducting a background check at a gun show.

The measure requires a gun show promoter to prominently post notice of the requirement of conducting background checks at the gun show. The measure requires the executive director of the department of public safety or his or her designee to prescribe a form to be used in posting notice of the background check requirement. The measure makes it a class 1 misdemeanor for a person to violate these provisions.

The measure exempts the transfer of certain antique firearms and relics and curios from the background check requirements of the article. The measure defines "collection," "firearm," "gun show," "gun show promoter," "gun show vendor," and "licensed gun dealer."

The measure requires the General Assembly to appropriate funds necessary to implement the new article. The measure would take effect March 31, 2001.

The Department of Local Affairs has determined that there would be no fiscal impact on local governments in Colorado resulting from implementation of the measure.

The Office of State Planning and Budgeting has determined that implementation of the measure would require a General Fund appropriation of between $357,383 and $494,211 for the first fiscal year of full [2] implementation, which would include:

- 10 to 15 additional temporary employees;

- 2 to 3 additional full-time employees for appeals from denied purchases;

- additional leased space; and

- additional computer and capital expenses for 12 to 18 employees.

There may be an additional cost for a web-based computer interface in the amount of approximately $578,060.

The Office of State Planning and Budgeting has determined that implementation of the measure would require a General Fund appropriation of between $297,416 and $411,227 for the subsequent fiscal year, which would include:

- 10 to 15 temporary employees;

- 2 to 3 full-time employees for appeals from denied purchases; and

- leased space.

There may be an additional cost of $31,500 for [3] continuation of the web-based computer interface.

In addition to these costs, it is likely that there would be state and local costs for law enforcement and incarceration, but the amount of such costs is indeterminate.

*Hearing April 5, 2000:*

*At the request of proponent, technical correction allowed in text of measure to change the last subsection of section 12–26.1–101 from "(d)" to "(4)";*

*Single subject approved; staff draft amended; titles and summary set.*

Hearing adjourned 7:05 p.m.

Hearing April 19, 2000:

*Motion for Rehearing submitted by William Bernard Herpin, Jr., denied.*

Motion for Rehearing submitted by Ari Armstrong and Debra Collins *granted in part* to the extent that titles were modified, and *denied* in all other respects.

2. On May 11, 2000, the Board filed a corrected summary with this court. The corrected summary deleted two transcription errors: it deleted the word "equal" between the word "full" and "implementation" in the eighth paragraph of the summary. The second corrected error occurred

in the summary's second to last paragraph. See note [3] below.

3. The Board deleted the word "the" between "for" and "continuation."

Motion for Rehearing submitted by Barry Wagoner *granted in part* to the extent that summary was modified in response to grounds stated in paragraphs 5, 30, 31, and 32 of the Motion, and *denied* with respect to all other grounds.

*Titles and summary amended.*

Hearing adjourned 3:58 p.m.

Hearing May 3, 2000:

*Motion for Rehearing submitted by Aimee L. Rathburn denied on grounds that Board lacked jurisdiction and that, even if it had jurisdiction, Motion would be denied on its merits.*

*Hearing adjourned 6:48 p.m.*

## APPENDIX B

Be it enacted by the People of the State of Colorado:

Title 12 of the Colorado Revised Statutes is amended by the addition of a new article, to read:

## ARTICLE 26.1

## BACKGROUND CHECKS—GUN SHOWS

**12–26.1–101. Background checks at gun shows – penalty.** (1) Before a gun show vendor transfers or attempts to transfer a firearm at a gun show, he or she shall:

(a) require that a background check, in accordance with section 24–33.5–424, C.R.S., be conducted of the prospective transferee; and

(b) obtain approval of a transfer from the Colorado Bureau of Investigation after a background check has been requested by a licensed gun dealer, in accordance with section 24–33.5–424, C.R.S.

(2) A gun show promoter shall arrange for the services of one or more licensed gun dealers on the premises of the gun show to obtain the background checks required by this article.

(3) If any part of a firearm transaction takes place at a gun show, no firearm shall be transferred unless a background check has been obtained by a licensed gun dealer.

(4) Any person violating the provisions of this section commits a Class 1 misdemeanor and shall be punished as provided in section 18–1–106, C.R.S.

**12–26.1–102. Records—Penalty.** (1) A licensed gun dealer who obtains a background check on a prospective transferee shall record the transfer, as provided in section 12–26–102, C.R.S., and retain the records, as provided in section 12–26–103, C.R.S., in the same manner as when conducting a sale, rental, or exchange at retail.

(2) Any individual who gives false information in connection with the making of such records commits a Class 1 misdemeanor and shall be punished as provided in section 18–1–106, C.R.S.

**12–26.1–103. Fees imposed by licensed gun dealers.** For each background check conducted at a gun show, a licensed gun dealer may charge a fee not to exceed ten dollars.

**12–26.1–104. Posted notice—penalty.** A gun show promoter shall post prominently a notice, in a form to be prescribed by the executive director of the department of public safety or his or her designee, setting forth the requirement for a background check as provided in this article.

(2) Any person violating the provisions of this section commits a Class 1 misdemeanor and shall be punished as provided in section 18–1–106, C.R.S.

**12–26.1–105. Exemption.** The provisions of this article shall not apply to the transfer of an antique firearm, as defined in 18 U.S.C. sec. 921(a)(16), as amended, or a curio or relic, as defined in 27 C.F.R. sec. 178.11, as amended.

**12–26.1–106. Definitions.** As used in this article, unless the context otherwise requires:

(1) "Collection" means a trade, barter, or in-kind exchange for one or more firearms.

(2) "Firearm" means any handgun, automatic, revolver, pistol, rifle, shotgun, or other instrument or device capable or intended to be capable of discharging bullets, cartridges, or other explosive charges.

(3) "Gun show" means the entire premises provided for an event or function, including

but not limited to parking areas for the event or function, that is sponsored to facilitate, in whole or in part, the purchase, sale, offer for sale, or collection of firearms at which:

(a) twenty-five or more firearms are offered or exhibited for sale, transfer, or exchange; or

(b) not less than three gun show vendors exhibit, sell, offer for sale, transfer, or exchange firearms.

(4) "Gun show promoter" means a person who organizes or operates a gun show.

(5) "Gun show vendor" means any person who exhibits, sells, offers for sale, transfers, or exchanges, any firearm at a gun show, regardless of whether the person arranges with a gun show promoter for a fixed location from which to exhibit, sell, offer for sale, transfer, or exchange any firearm.

(6) "Licensed gun dealer" means any person who is a licensed importer, licensed manufacturer, or dealer licensed pursuant to 18 U.S.C. sec. 923, as amended, as a federally licensed firearms dealer.

**12–26.1–107. Appropriation.** The General Assembly shall appropriate funds necessary to implement this article.

**12–26.1–108. Effective date.** This article shall take effect March 31, 2001.