# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00379-CV

**Edwards Aquifer Authority; Gregory M. Ellis, General Manager of the Authority, in his official capacity; and Carol Patterson, Michael Beldon, Levi Jackson, Rafael Zendejas, Susan Hughes, Doug Miller, Ken Barnes, Bailey Barton, Hunter Schuehle, Luana Buckner, Bruce Gilleland, Rogelio Munoz, George Rice, Johnny A. Rodriguez, Jr., and Cheryl Gilpin, in their official capacities, Appellants**

**v.**

**Chemical Lime, Ltd., Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. C2002-0547 A, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## O P I N I O N

In the 1993 Edwards Aquifer Authority (EAA) Act, the legislature established a new regulatory scheme to govern use of groundwater from the aquifer and a new agency, appellant Edwards Aquifer Authority (the Authority), to administer the regime. The legislature granted a preference under the EAA Act's permitting regime to existing users of aquifer water. To obtain the preference, the EAA Act provided that existing users had to file with the Authority a declaration of historical use by March 1, 1994—exactly six months after the EAA Act's effective date. Intervening

legal developments barred implementation of the EAA Act until 1996, when the supreme court rejected constitutional challenges to the EAA Act and vacated an injunction against its enforcement in *Barshop v. Medina County Underground Water District*, 925 S.W.2d 618 (Tex. 1996). In lieu of the then-expired 1994 statutory deadline, the Authority, relying on an interpretation of *Barshop*, set by rule a deadline of December 30, 1996—six months after the *Barshop* opinion was issued—for existing users to file declarations of historical use. Appellee Chemical Lime, Ltd., whose New Braunfels plant had used aquifer water since the early 1900s, filed its declaration on January 17, 1997. Over three years later, the Authority rejected Chemical Lime's declaration for being untimely filed, thereby depriving Chemical Lime of preference as an existing user.

Chemical Lime sought a declaration in district court that the Authority's filing deadline rule was not authorized by the EAA Act and *Barshop*, and, in the alternative, that Chemical Lime had substantially complied with the filing requirements. The district court rendered judgment invalidating the rule and declared both that Chemical Lime's declaration had been timely filed as a matter of law and that Chemical Lime had substantially complied with the filing requirements even if the Authority's deadline was proper. It also awarded Chemical Lime attorney's fees. The Authority appeals this judgment.

*Barshop* compels us to reverse the district court's judgment invalidating the Authority's filing deadline rule and render judgment that Chemical Lime's filing was untimely as a matter of law. Under these circumstances, moreover, we are required to render judgment awarding the Authority its attorney's fees.

2

## BACKGROUND

As its name suggests, Chemical Lime produces lime, a product used in road construction, steel manufacture, water treatment, and the removal of sulfur compounds from emissions from coal-fired plants.[1] In 1999, Chemical Lime bought APG Lime, including a lime-production plant in New Braunfels. This plant, in operation since 1907, uses water for lime processing, dust suppression, the cooling of equipment, drinking water, and sanitation. The plant's sole water source is well water from the Edwards Aquifer, an underground system of water-bearing formations that includes all or parts of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina, and Uvalde counties. *See Barshop*, 925 S.W.2d at 624-25.

The Edwards Aquifer Authority is a conservation and reclamation district created by the legislature in 1993 and empowered to regulate groundwater withdrawals by well from the aquifer. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, §§ 1.02, 1.14, 1.41, 1993 Tex. Gen. Laws 2350, 2350-2372 (EAA Act); *see* Tex. Const. art. XVI, § 59(a). Because this appeal concerns procedural requirements relating to the Authority's regulation of the aquifer, it is helpful first to examine these requirements—and various legal developments that ultimately delayed their effect—in order to place the Authority's appellate issues in context.

---

[1] The "chemical" reference in the company's name reflects the grade of lime it produces, not its use or creation of chemicals. It makes lime by quarrying limestone, crushing it, and applying heat, using only limestone, a heat source, and water in this process. The heat comes from a mixture of coal and petroleum coal, augmented by natural gas.

**The Edwards Aquifer Authority Act**

Among other limitations, the EAA Act imposed aquifer-wide limits on water withdrawals by non-exempt wells and empowered the Authority to allocate the caps among wells through a permit system.[2]  EAA Act § 1.14(b) & (c).  The legislature gave "existing users" preference under the permit system.  *See id*. § 1.16.  "Existing users" were defined as persons who withdrew and beneficially used underground water from the aquifer on or before June 1, 1993.  *Id*. § 1.03(10).  "An existing user may apply for an initial regular permit by filing a declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972, through May 31, 1993."  *Id*. § 1.16(a).  The Authority was authorized initially to grant regular permits solely to existing users who properly filed a declaration of historical use and who established "by convincing evidence beneficial use of underground water from the aquifer."  *Id*. § 1.16(d).  Existing users were entitled to an amount of water equal to their maximum beneficial use of water during any one calendar year of the historical period unless the total amount of such maximums by all existing users in the aquifer exceeded 450,000 acre-feet per year through the year 2007 and 400,000 acre-feet per year thereafter.  *Id*. §§ 1.14(b), (c), 1.16(e).  If total maximum historical usage exceeded this level, the legislature required the Authority to reduce proportionately the amounts of withdrawals under the permits as necessary to meet the cap.  *Id*. § 1.16(e).  Conversely, to the extent that unallocated water within the cap remained after the issuance of permits

---

[2]  Wells producing no more than 25,000 gallons per day for domestic or livestock purposes were exempted from the caps and the permit system.  EAA Act §§ 1.16(c), 1.33.

4

to existing users who properly applied, the Authority was authorized to issue additional regular permits, subject to the cap. *Id*. § 1.18(a).

As originally enacted, the EAA Act required existing users to file their "declaration of historical use" on or before March 1, 1994. *Id*. § 1.16(b). This date was exactly six months after the original effective date of the EAA Act, September 1, 1993. *See id*. § 4.02. Until the Authority actually began granting regular permits, existing users could continue to beneficially withdraw and beneficially use water, provided it was not wasted. *Id*. § 1.17.

**The *Barshop* litigation and other delays**

The EAA Act also provided that the Authority's board of directors would be appointed by various governing bodies affected by the Authority. *Id*. § 1.09. This appointment procedure was required to be submitted to the United States Department of Justice for administrative preclearance under section 5 of the Voting Rights Act. *See* 42 U.S.C.A. § 1973c (West 2003). The Department refused preclearance on the basis that the EAA Act contemplated appointive rather than elective selection of the Authority's board. This made the appointment provision unenforceable. *See id*. The legislature did not attempt to remedy the EAA Act's section 5 problem until its next regular session in 1995. Thus, the EAA Act's original September 1, 1993 effective date and its March 1, 1994 deadline for existing users to file declarations of historical use both passed during a period in which the EAA Act was made unenforceable by federal law.

In 1995, the legislature amended the EAA Act to change the board's selection method from appointment to election. Act of May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen.

Laws 2505, 2505-17 (amendments to the EAA Act).[3]   The legislature provided that these

amendments would take effect on August 28, 1995, and the Department of Justice precleared the

amended EAA.  *Id*. at 2517; *Barshop*, 925 S.W.2d at 625.  However, the legislature did not amend

the EAA Act's original March 1, 1994 historical use declarations filing deadline or otherwise address

how this expired deadline was to be adjusted.

Six days before the amendments to the EAA Act were to take effect, a group of local

underground water conservation districts and agricultural interests brought a constitutional challenge

to the EAA Act in the district court of Medina County and sought to restrain its administration and

enforcement.  The district court held the EAA Act unconstitutional and enjoined the State from

enforcing it.  *Barshop*, 925 S.W.2d at 625.  The effective date of the EAA Act, as amended, passed

while the State was enjoined from enforcing it.  On direct appeal, the Texas Supreme Court, in an

opinion issued on June 28, 1996, found the EAA Act constitutional, dissolved the district court's

injunction, and remanded for consideration of the State's entitlement to attorney's fees.  *Id*. at 637-

38.

The supreme court in *Barshop* rejected the plaintiffs' argument that the EAA Act

effected an unconstitutional taking of existing users' property rights by imposing a then-impossible

March 1, 1994 deadline to file the historical use declaration.  *Id*. at 628.  Eschewing a literal

interpretation of the deadline provision, the supreme court construed it as merely "directory" rather

than "mandatory."  *Id*. at 628-30.  The statutory deadline, in other words, merely manifested the

---

[3]   We will hereafter refer to both the EAA Act and the amendments to the EAA Act collectively as the EAA Act except where necessary to distinguish specific amendments.

6

broader legislative intent "that declarations of historical use [are] to be filed six months after the Authority becomes effective." *Id*. at 630. The court explained that the legislature "obviously intended that existing users would have preference over future users" and thus "provided existing users the opportunity to file their declarations with the Authority after the effective date of the Act but before allocation of water to other potential users." *Id*. at 629. Having construed the statutory deadline to provide existing users an opportunity to file historical use declarations, the supreme court held that the EAA Act did not effect a taking. *Id*. at 630.

The supreme court denied rehearing of its judgment on August 16, 1996.

**The Authority responds to *Barshop***

In the aftermath of *Barshop*, the Authority promulgated rules setting forth the procedures governing the filing of declarations of historical use.[4] *See* 21 Tex. Reg. 11377, 11377-84 (1996) (codified at 31 Tex. Admin. Code §§ 701.1-.5, .11-.13, .15-.19, .21-.22) (adopted Nov. 22, 1996). The Authority published proposed rules on September 3, 1996, *id*. at 13784, and final rules on October 31, 1996, with an effective date of November 21, 1996. *Id*. The proposed rule set a deadline of December 28, 1996, a Saturday, for existing users to file their declarations of historical use. *Id*. at 11382. The Authority chose that date based on its interpretation of *Barshop*. *Id*. at

---

[4] "A declaration is an application for initial regular permit, and is to be filed with the Authority in accordance with this chapter." 21 Tex. Reg. 11377, 11377-84 (1996) (codified at 31 Tex. Admin. Code §§ 701.12) (adopted Nov. 22, 1996).

11378. It understood the supreme court to hold that the deadline for existing users to file declarations of historical use would be six months after the date the EAA Act had become "fully effective." *Id*. The Authority concluded that the EAA Act became effective on June 28, 1996, the same date the supreme court issued the *Barshop* opinion. It reasoned that the implementation of the amended EAA Act had been suspended by a district court injunction but that the "injunction was dissolved by the Texas Supreme Court on June 28, 1996, and the Act thereby became effective on that date." *Id*.

In response to comments, the Authority moved the deadline to December 30, the first Monday following the 28th, to address concerns that its offices otherwise would have been closed on the Saturday deadline. *Id*. at 11381. Foreshadowing the issues in this appeal, the Authority rejected arguments that the deadline should be based not on the date the *Barshop* opinion was issued but on subsequent events in the appeal:

> A commentator contended that the filing date should be February 28, 1997, which is six months after the date the Texas Supreme Court issued its mandate on August 31, 1996 in *Barshop* . . . sending the case back to the trial court. The filing date stated in the rule is December 30, 1996, six months after the Texas Supreme Court dissolved the trial court injunction that had blocked the Act from taking effect. The staff adheres to the December date, because the Act became fully effective on June 28, 1996, when the injunction was dissolved. The dissolution of the injunction was immediately effective, and was not delayed by subsequent procedural steps in the Supreme Court. The staff recommends against adopting the February date because it is inconsistent with the Legislature's intent to require filing of declarations of historical use six months after the actual effective date of the Act. Adopting the later date would also expose those applications who would file after December 30, 1996, to litigation attacking the filings as untimely.

*Id*.

8

**Chemical Lime files its permit application**

From at least 1992, the New Braunfels plant now owned by Chemical Lime had been reporting its monthly water usage to the Texas Natural Resource Conservation Commission (TNRCC).[5] In November 1996, John Kret, the plant manager, received by mail an "Application for Initial Regular Permit and Declaration of Historical Use" from the Authority. Kret gave the form to Jim Johnson, the plant manager, to complete and file with the Authority. Because Johnson thought that the information requested was similar to the information Chemical Lime had previously been required to file with the TNRCC, which was also due at the end of the year, Johnson decided to fill out both forms at the same time. Only later did Johnson discern that the Authority was requesting twenty-one years of back data; the TNRCC required only one year of data. Johnson testified that, in mid-December 1996, he called the Authority to inquire if they needed "good" data or if he could provide estimates. He could not remember the name of the person with whom he spoke, but he claimed that he identified himself to an Authority employee, who informed him that the Authority needed actual data from all years in the twenty-one year period, not estimates.

Johnson then attempted to recover the data requested but was unable to find all the records for the years requested. Sometime between December 25 and December 30, he again called the Authority. He testified that he spoke with Gayle Kipp[6] and told her that he would not be able to submit a complete application by December 30 unless he was able to supply estimated data for some

[5] Formerly, the Texas Water Board and currently the Texas Commission on Environmental Quality.

[6] Johnson could not remember Kipp's name. Kret reported that Johnson told him her name at the time. Kipp, an Authority employee, testified that she did not remember this conversation but she also could not deny that it could have happened.

9

years. He testified that Kipp told him to "get it in when you get it—when you get that data on it." According to Kipp's testimony, Authority staff had instead been instructed that the applications could be submitted without complete water use data and that data could be filed after the deadline.[7] Johnson filed the application with the Authority on January 17, 1997. It was incomplete because he was not able to find data for all of the requested years.

In February 1997, the Authority sent Chemical Lime a letter "acknowledg[ing] the receipt of your application for initial regular permit." It also stated that Chemical Lime's "application is administratively complete during the initial administrative review process." The Authority began processing applications sometime in March. Kipp conducted a field inspection of the New Braunfels facility in June. In December, the Authority advised Chemical Lime that it "preliminarily found that your application provides sufficient convincing evidence to substantiate your declaration of historical use." It determined an amount of Chemical Lime's "maximum beneficial use of water without waste" and stated that Authority staff "will be recommending that you receive a permit according to your application." In April 1998, the Authority notified Chemical Lime that "the technical review of the application was completed on 3/21/98," and, on April 24, it issued Chemical Lime an "Initial Regular Permit" to withdraw water from the Aquifer, "subject to final action of the Board of Directors of the Authority." Thus, Chemical Lime was still not yet

---

[7] Rick Illgner, at the time acting general manager of the Authority, and Steven Walthour, a supervisory geologist with the Authority, also testified that applicants could supplement their applications after December 30. Walthour testified that the reason the Authority would allow supplements to applications was that it recognized that there was a short period of time for people to gather the necessary information. They both testified that the Authority would not consider new applications filed after December 30.

entitled to begin withdrawing water under a permit. At the Authority's request, Chemical Lime provided further information in support of its application in May 2000.

In November 2000, the Authority rejected Chemical Lime's application, finding that its declaration of historical use was not filed timely (before December 30, 1996)[8] and that its historical withdrawals were not placed to a beneficial use for irrigation, municipal, or industrial use. Chemical Lime then filed its notice of protest in December. Several Chemical Lime employees met with Walthour in January 2001 to discuss the rejection of the application. Walthour told them that they would need to schedule an "informal meeting," which was later set for October 2001. The Authority also sent Chemical Lime a letter in May, scheduling an "informal meeting" in October as "an opportunity to provide evidence to support their protest." The Authority staff attorney with whom they met in October stated that he did not have authority to make decisions concerning applications, and so another meeting was scheduled with Gregory Ellis, the General Manager of the Authority, for later in the month. At that meeting, Ellis requested more information in support of Chemical Lime's application, which Chemical Lime filed with the Authority in December 2001. In May 2002, Ellis rejected Chemical Lime's requests.

**Proceedings below**

Chemical Lime filed suit in district court seeking declarations that: (1) the Authority's rule establishing a December 30, 1996 filing deadline was invalid and that Chemical Lime's initial

---

[8] The Authority attributes its sudden reversal to its discovery, in 2000, of an error in its "coding" of Chemical Lime's application in its database. Because of this error, the application was not coded as having been filed after the December 30, 1996 deadline, and thus escaped notice. This error was not discovered until 2000.

regular permit application was filed timely on January 17, 1997; (2) the EAA Act—specifically, the legislature's repeal of section 1.11(h) of the EAA Act, which had made the EAA subject to the Administrative Procedures Act—violates constitutional protections of due course of law, separation of powers, open courts and jury trial because it affords inadequate judicial review of EAA determinations;[9] (3) the EAA's "unlawful actions" effected an unconstitutional taking; and (4) in the alternative, assuming that the EAA's December 30, 1996 filing deadline was valid, Chemical Lime had substantially complied with it. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 1997 & Supp. 2004-05). The district court severed the takings claim. The deadline validity issue and remaining constitutional claims were tried to the district court on stipulated facts. The substantial-compliance issue was tried to a jury, which found in Chemical Lime's favor. The district court rendered judgment that the Authority's December 30, 1996 deadline was invalid and Chemical Lime's IRP application was timely filed. It held in the alternative that Chemical Lime had substantially complied with the application requirements and that "the Authority's denial of Chemical Lime's IRP application on the grounds that it was not timely is invalid, improper, and illegal." However, the district court rendered judgment that the legislature's repeal of section 1.11(h) did not violate the constitutional protections of due course of law, separation of powers, open courts, and jury trial. Finally, the district court awarded Chemical Lime attorney's fees and costs, and later made findings of fact and conclusions of law regarding this portion of the judgment. This appeal followed.

---

[9] *See Barshop v. Medina County Underground Water District*, 925 S.W.2d 618, 632-33 (Tex. 1996).

## DISCUSSION

The Authority presents four issues on appeal. It first contends that the district court erred in invalidating the Authority's rule setting December 30, 1996 deadline for filing declarations of historical use. It urges that the effective date of the EAA Act was June 28, 1996, the date *Barshop* was decided, and that *Barshop* and the legislative intent underlying the EAA Act compelled the agency to set its deadline, December 30, the first business day following six months after the date *Barshop* issued. The Authority next challenges the district court's alternative holding that Chemical Lime substantially complied with a December 30 deadline. In its second issue, the Authority contends that, as a matter of law, a party cannot be in "substantial compliance" with a filing deadline when there is no dispute that the party failed to file any portion of the filing until after that deadline. Predicated on this argument, the Authority asserts in its third point that there is no evidence that Chemical Lime substantially complied with the December 30, 1996 deadline.

In its fourth issue, the Authority presents two arguments challenging the district court's award of attorney's fees. It begins with the assertion that Chemical Lime cannot recover attorney's fees under the UDJA because the water code provides Chemical Lime with its exclusive remedies and does not provide for attorney's fees. *See* Tex. Water Code Ann. §§ 36.251-.254 (West 2000); *Hageman v. Luth*, 150 S.W.3d 617, 627 (Tex. App.—Austin 2004, no pet.); *Strayhorn v. Raytheon E-Systems, Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied); *Young Chevrolet v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied). Second, the Authority asserts that, if it prevails on the merits of its first three issues, an award of

13

attorney's fees to the Authority is mandatory. *See* Tex. Water Code Ann. § 36.066(g) (West Supp. 2005).

***Barshop* and the deadline for filing a declaration of historical use**

In its first issue, the Authority asserts that its December 30, 1996 historical use declaration filing deadline is authorized under the EAA Act, as construed in *Barshop*. This issue presents pure questions of law, which we review *de novo*.[10] *See In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004); *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994).

The Authority's argument rests upon two subsidiary propositions. First, the Authority interprets *Barshop* to hold that the historical use declaration filing deadline is six months after the EAA Act's effective date. Second, the Authority contends that the EAA Act's effective date was June 28, 1996, at the moment when the supreme court issued its *Barshop* opinion dissolving the injunction barring implementation of the EAA Act. Therefore, the Authority concludes, its rule setting a filing deadline of December 30, 1996 is within its statutory powers,[11] and Chemical Lime's January 17, 1997 filing is untimely as a matter of law.

---

[10] In its briefing, the Authority contended that its choice of the December 30, 1996 deadline is entitled to deference. It abandoned this position at oral argument, however, conceding that our standard of review regarding this issue is *de novo*.

[11] The parties do not dispute that the code construction act's method of counting months governs here. *See* Tex. Gov't. Code Ann. § 311.014(c) (West 2005). Under this method, if the number of months is to be computed by counting the number of months from a specific day, the period ends on the same numerical day in the concluding month as the day of the month from which the computation began. *Id*. Also, if the last day of a period ends on a Saturday, Sunday, or legal holiday, the period is extended to the next day that is not a Saturday, Sunday, or legal holiday. *Id*. § 311.014(b). Here, because the six-month period expired on December 28, 1996, a Saturday, the Authority extended the deadline to the following Monday, December 30.

14

Chemical Lime does not dispute the Authority's view that *Barshop* fixes the filing deadline at six months after the EAA Act's effective date but differs as to when the effective date was. Chemical Lime argued in its brief that the EAA Act did not become effective until at least August 16, 1996, the date the supreme court denied rehearing in *Barshop*, because the ruling dissolving the injunction was not final until that date. During oral argument, Chemical Lime suggested that the date the supreme court issued its mandate in *Barshop*—August 31, 1996—might also control. Six months after these dates would have been February 16, 1997 or February 28, respectively.[12] In either case, the Authority's rule setting an earlier deadline would have been invalid, and Chemical Lime's filing would have been timely.

### When the EAA Act became enforceable

While both parties (and even the supreme court in *Barshop*) suggest that the EAA Act's "effective date" had been postponed by the section 5 preclearance problems and the *Barshop* injunction, that did not occur in a literal sense. Inasmuch as a court's enjoining of a statute only delays its enforcement and does not alter its effectiveness, the effect of the section 5 delays and the district court injunction also could only bar implementation and enforcement of the EAA Act once it took effect, not change the date the legislature specified for the EAA Act to take effect. *See Texas Highway Comm'n v. West Tex. Drilling, Inc.*, 366 S.W.2d 242, 244 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) (injunction prevents enforcement of statute); *see also* Tex. Const. art I, § 28

---

[12] Because there is no thirty-first day in February corresponding to August 31, the six-month period would have ended on the last day of the month. *See* Tex. Govt. Code Ann. § 311.014(c) (West 2005).

(suspension of law only within power of legislature); 42 U.S.C.A. § 1973c. Stated another way, the EAA Act took effect in 1993, but its implementation and enforcement were barred by section 5 of the voting rights act. *See* 42 U.S.C.A. § 1973c. Subsequently, the legislature amended the EAA Act to address the preclearance issues and made this new version effective on August 28, 1995. Act of May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen. Laws 2505, 2517. Prior to that date, the *Barshop* district court enjoined the amended EAA Act's implementation and enforcement. The amended EAA Act took effect while this injunction remained in effect. Considering the context, we believe that the supreme court in *Barshop* used such terms as "effective date" and "date the Authority becomes effective" not in their literal sense but as shorthand references to the date on which the legal impediments to the EAA Act's implementation and enforcement were finally removed.

We agree with the Authority that the EAA Act became enforceable on June 28, 1996, when the supreme court issued its *Barshop* opinion dissolving the district court's injunction barring the EAA Act's implementation and enforcement. In making this determination, we are guided by a decision of the Texas Supreme Court in *Flanary v. Wade*, 113 S.W. 8 (Tex. 1908). In that land title suit, the supreme court was required to determine who was entitled to a particular tract of land that had been sold under execution as a result of a previous suit. *Id*. at 9. In the earlier suit, the district court had held in favor of the plaintiff, but the court of civil appeals, in a decision rendered April 18, 1903, had ordered that the judgment of the district court be reversed and the cause remanded unless the appellee filed a remittitur within twenty days. *Id*. A remittitur was timely filed, and on May 9, 1903 the appellate court ordered that the judgment be affirmed in the original amount

without the remittitur. *Id*. The plaintiff in the district court caused a writ of execution to be issued on April 28, 1903, and on May 8 the writ was levied on the land of the defendant. *Id*. The land was sold under this execution on July 7. *Id*. The supreme court held that the execution had been issued on a judgment that was then annulled by the court of civil appeals. *Id*. at 9-10. For this reason, the court held that the sale of the land was void and conferred no title upon the buyer, or his assignee who was a party to the land title suit, notwithstanding that the judgment had been affirmed when the sale took place. *Id*. at 10. The court reasoned:

> On the 28th day of April, 1903, there was no judgment in the District Court of Bosque County between the parties hereto which would authorize the issuance of the execution that the clerk of that court issued directed to the sheriff of Erath County; therefore the execution issued upon the judgment which had been annulled by the Court of Civil Appeals, being without authority, was void, and the levy made by virtue of that execution upon the land in controversy on the 8th day of May was likewise invalid. It follows that, the execution and the levy upon which the subsequent proceeding and sale depended being invalid, the sale itself was void and conferred no title upon Wood who purchased at the sale made on July 17, 1903. The title of Wade being derived from Wood, necessarily falls with it, and the conclusion must be reached that Wade had no cause of action in this case for the recovery of this land.
>
> The subsequent affirmance of the judgment of the District Court of Bosque County by the Court of Civil Appeals was in fact the entering of a new and different judgment, but in no phase of the case could the subsequent entry of the judgment have the effect to make valid that which was void before.

*Id*. In short, the supreme court held that the judgment of the court of civil appeals was immediately effective to set aside the trial court's judgment and render it inoperative, despite the fact that the judgment of the court of civil appeals was still subject to being set aside by the court of civil appeals itself or by the supreme court and that no mandate had issued. *See also Humble Exploration Co. v.*

17

*Walker*, 641 S.W.2d 941, 943 (Tex. App.—Dallas 1982, orig. proceeding) (appellate court order vacating receivership operated instantly; therefore, trial court was without jurisdiction to continue receivership).

More recently, in a case concerning a post-judgment garnishment, the Fifth Circuit recognized *Flanary*'s continuing vitality in Texas law. *See In re Bohart*, 743 F.2d 313, 319-21 (5th Cir. 1984). *Bohart* concerned, in part, a post-judgment writ of garnishment that had been entered against Bohart by a Texas district court, which the Dallas court of civil appeals had reversed.[13] *Id.* at 316. In particular, it noted that "a reversal by the Court of Civil Appeals results in the immediate suspension of the judgment of the district court. This is so even though the mandate has not issued in the case and there is a petition for writ of error pending." *In re Bohart*, 743 F.2d at 321.

In still more recent times, the supreme court has emphasized the significance of the mandate in determining when an appellate court judgment becomes enforceable in a lower court. The mandate is the formal command from an appellate court commanding the lower court to comply with the appellate court's judgment. *See* Tex. R. App. P. 51.1(b), 65.2; *In re Grossnickle*, 115 S.W.3d 238, 243 (Tex. App.—Texarkana 2003, orig. proceeding); *Lewelling v. Bosworth*, 840 S.W.2d 640, 642-43 (Tex. App.—Dallas 1992, orig. proceeding); *Dixie Gas & Fuel Co. v. Jacobs*, 66 S.W.2d 446, 448 (Tex. Civ. App.—Beaumont 1933, writ dism'd w.o.j.) (citing *Black v. Epperson*, 40 Tex. 162, 172-73 (Tex. 1874)). A trial court cannot enforce a judgment of an appellate

---

[13] The Texas Supreme Court later reversed the judgment of the court of civil appeals. *See In re Bohart*, 743 F.2d 313, 317 (5th Cir. 1984); *Universal Metals & Mach., Inc. v. Bohart*, 539 S.W.2d 874 (Tex. 1976). *In re Bohart* concerned the validity of continuing garnishment after the judgment of the court of civil appeals but before the judgment of the supreme court. 743 F.2d at 324.

18

court before mandate issues. *See In re Long*, 984 S.W.2d 623, 625-26 (Tex. 1999); *see also* Stacy Obenhaus, *It Ain't Over 'Til It's Over: The Appellate Mandate in Texas Courts*, 15 The Appellate Advocate: State Bar of Texas Appellate Section Report 4, 5-8 (2003). In *Long*, for example, the district clerk had been enjoined by the district court from collecting certain filing fees and appealed that injunction. *Long*, 984 S.W.2d at 624. The district court later found the clerk in contempt for violating the injunction and issued fines, and the clerk appealed. *Id*. The supreme court noted that the clerk's original notice of appeal had functioned as a supersedeas bond. *Id*. at 626. It then held that "the Clerk could not be held in contempt for violating the injunction until all appeals relating to the judgment were exhausted and a mandate enforcing the injunction was issued." *Id*.; *see also Saudi v. Brieven*, 176 S.W.3d 108, 2004 Tex. App. LEXIS 9595, at *17 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

In this case, we are not concerned with the enforceability of an appellate judgment in the trial court, as in *Long*, but with the enforceability of a lower court judgment once an appellate court reverses it. As in *Flanary*, the supreme court's opinion in *Barshop* was immediately effective to set aside the trial court's injunction, rendering it inoperative.

In response, Chemical Lime argues that the EAA Act could not have become enforceable until August 16, 1996, the date the supreme court denied the motion for rehearing in *Barshop*. *See Ranger Ins. Co. v. Robertson*, 680 S.W.2d 618, 621 (Tex. App.—Austin 1985) (district court had no jurisdiction to render consent judgment on parties' settlement agreement entered into after supreme court announced its opinion but while motion for rehearing was pending), *aff'd in relevant part*, *Robertson v. Ranger Ins. Co.*, 689 S.W.2d 209 (Tex. 1985); *Brown v.*

*Linkenhoger*, 153 S.W.2d 342, 343 (Tex. Civ. App.—El Paso 1941, writ ref'd w.o.m.) (supreme court's judgment not final until court has acted on motion for rehearing; deadline for issuing mandate calculated from action on motion for rehearing, not from issuance of opinion). However, the fact that the supreme court retained jurisdiction until August 16 to alter its disposition of the district court's judgment—and could have, but did not do so—presented no barrier to the implementation and enforcement of the EAA Act. Once the supreme court vacated the district court's injunction on June 28,1996, the EAA Act immediately could be implemented and enforced unless and until the supreme court ordered otherwise. *See In re Bohart*, 743 F.2d at 321; *Flanary*, 113 S.W. at 10.

### *When the six-month filing period was triggered*

Both parties construe *Barshop* to set the historical use designation filing deadline as six months after the EAA's "effective date" (*i.e.*, the date the EAA Act became enforceable). The *Barshop* court does ultimately conclude that "we interpret the Act as requiring declarations of historical use to be filed six months after the Authority becomes effective." *Barshop*, 925 S.W.2d at 630. As an intermediate appellate court, we are bound to follow this holding and agree with the Authority that its rule setting a deadline of December 30, 1996—the first weekday following six months after the date the EAA Act became enforceable—was within its powers. However, our examination of *Barshop* causes us to question whether the supreme court intended its opinion to be applied so broadly.

The issue presented in *Barshop* was whether the EAA Act effected a taking from existing users by continuing to impose a then-impossible March 1, 1994 deadline to file the declarations necessary to preserve their historic use rights. *Id*. at 628. To avoid the conclusion that

20

the filing deadline had lapsed in 1994, the State, in defense of the EAA Act's constitutionality, urged the supreme court to construe the deadline more generally to allow existing users "six months after the eventual effective date of the statute" (corresponding to the six-month difference between the EAA Act's original September 1, 1993 effective date and its March 1, 1994 filing deadline) to file their declarations. *Id.* The supreme court's ultimate conclusions are stated with reference to this argument. However, the focus of the court's analysis was on avoiding the takings problem, which it did by construing the March 1, 1994 statutory deadline as a more general requirement that existing users have six months to file their declarations of historical use—not on deciding when, precisely, that six-month period begins to run.

The foundation of the *Barshop* court's analysis was the principle that statutory deadlines will be construed as merely "directory" rather than mandatory when necessary to effectuate broader legislative intent. *Id.* at 629-30 (citing *Chisolm v. Bewley Mills*, 287 S.W.2d 943, 945 (Tex. 1956); *Thomas v. Groebl*, 212 S.W.2d 625, 630 (Tex. 1948); and *Stephenson v. Stephenson*, 22 S.W. 150, 151 (Tex. 1893)). *Stephenson* involved an issue of deadlines similar to the present case. On March 28, 1892, the district court entered a judgment against a plaintiff. *Stephenson*, 22 S.W. at 150. The plaintiff-appellant perfected appeal in the district court. *Id.* At that time, the courts of civil appeals were not yet in existence so the appeal would have been taken directly to the supreme court. *Id.* Thereafter, the legislature passed the enabling act creating the courts of civil appeals and defining their jurisdiction and procedures. *See* Act to Organize the Courts of Civil Appeals §§ 1-

21

54.[14] One of the new statutory procedural requirements set a deadline of 90 days after perfection of the appeal for appellants to file the transcript with the appellate court clerk. *Id*. § 20. The enabling act took effect on September 1, 1892, *id*. § 54, while the appeal was pending. The plaintiff-appellant did not deliver the transcript to the clerk of the court of civil appeals until December 5, 1892, more than 90 days after September 1. *Stephenson*, 22 S.W. at 150. The court of civil appeals overruled the plaintiff-appellant's motion to order the clerk to file the transcript and affirmed the judgment of the district court. *Id*.

The supreme court reversed. *Id*. at 151. It noted that the enabling act of the courts of civil appeals did not explicitly address the treatment of appeals that had been perfected before the statute's effective date. *Id*. at 150. Because the supreme court found that "the intention of the legislature is not express" regarding such cases, the court felt at liberty in "resorting to the utmost liberality of construction in order to prevent the forfeiture of a valuable right." *Id*. at 151. The supreme court then reasoned that, regarding appeals already pending when the act took effect, "we shall best conform to the intention of the legislature by following that practice which is in closest analogy to the rule prescribed for other cases. We should therefore allow 90 days, either from the date the act took effect [September 1], or from the time the courts of civil appeals were organized." *Id*.

To choose between the two alternatives, the supreme court opted for the later date. Key to this determination was that the enabling act did not become fully operative until the first

---

[14] Act approved April 13, 1892, 22d Leg., 1st C.S., ch. 15, §§ 1-54, 1892 Tex. Gen. Laws 25, 25-34, *reprinted in* 10 H.P.N. Gammel, The Laws of Texas 1822-1897, at 389, 389-398.

Monday in October, the first day of the term of the courts of civil appeals.[15] *See id*. Thus, "[n]o transcript could be filed in any court of civil appeals before [that] date, because there could be no clerk with whom to file it." *Id*. On this basis, the court concluded that "the better and the more reasonable rule [is] to allow the 90 days from the latter date; that is to say, from the time at which the statute became operative upon the case, and it became possible for appellants to have placed their transcript upon the files of the court." *Id*.

The *Barshop* court returned to these principles to find the EAA Act's March 1, 1994 deadline directory rather than mandatory, and that it thus did not effect a taking. Noting that "the Act provides for permits to be granted to existing users before any provision is made for future users," the supreme court concluded that "the Legislature obviously intended that existing users would have preference over future users." *Id*. at 629. "To implement this intent," the court observed, "the Legislature provided existing users the opportunity to file their declarations of historical use with the Authority after the effective date of the Act but before the allocation of water to other potential users." *Id*. "A contrary conclusion," the court suggested, "would require the fallacious reasoning that the Legislature intended the provisions favoring existing users to be subject to an impossible condition in the event of a delay in implementing the Act." *Id*. Similarly, while acknowledging that the legislature had not adjusted the March 1, 1994 deadline in its 1995 amendments to the EAA Act, the court refused to construe such inaction as manifesting what it characterized as an intent to impose an impossible condition on existing users. *Id*. ("It is nonsensical

---

[15] *See* Act approved April 13, 1892, 22d Leg., 1st C.S., ch. 18, § 8, 1892 Tex. Gen. Laws 45, 46, *reprinted in* 10 H.P.N. Gammel, The Laws of Texas 1822-1897, at 409, 410.

to argue that the Legislature, in taking the trouble in 1995 to amend the Act to satisfy the Voting Rights Act concerns of the Justice Department, intended that the existing-user provision would be subject to an impossible condition that would render the entire Act unconstitutional and void."). The court also emphasized the presumption that statutes are constitutionally valid and should be construed so to avoid constitutional infirmities when possible. *Id*.

Based on this analysis, the *Barshop* court held that "the March 1, 1994 deadline contained in the Act was intended to provide existing users *six months to file their declarations of historical use*." *Id*. at 630 (emphasis added). The court then equated this "legislative intent . . . as requiring declarations of historical use to be filed *six months after the Authority becomes effective*," *id*. (emphasis added), consistent with the State's argument. But setting a deadline of exactly six months following the date the EAA Act became enforceable for existing users to file their declarations does not necessarily afford them the "six months to file their declarations of historical use" intended by the legislature. While requiring existing users to file historical use declarations, the EAA Act was silent concerning the procedures for filing or what the declarations must contain; rather, the legislature contemplated that the Authority would promulgate forms detailing the information that would be required and set any filing fees. EAA Act § 1.16(b). The Authority did not promulgate proposed rules delineating these requirements until September 3, 1996, and these rules did not take effect until November 21, 1996. Thus, the earliest date on which Chemical Lime possibly could have filed its declaration of historical use was November 21—barely one month before the Authority's filing deadline—and Chemical Lime could not have known the proposed requirements for declarations, so as to begin to prepare its filing, until September 3. If the

24

legislature's intent was to afford existing users "six months to file their declarations of historical use," *Barshop*, 925 S.W.2d at 630, then arguably the six-month filing period would had to have run from the September or November date.

Such a conclusion would be supported by *Stephenson*, in which the supreme court construed the 90-day statutory deadline for filing transcripts in the new courts of civil appeals to run from the date the court clerks were first open and capable of accepting filings, October 1, 1892, rather than simply the date the statute took effect, September 1, 1892. *Stephenson*, 22 S.W. at 151. The supreme court emphasized that "the intention of the legislature is not express"—*i.e.*, that judges are largely speculating about what the legislature might have done rather than what it actually did[16]—and that, under such circumstances, it would "resort[] to the utmost liberality of construction in order to prevent the forfeiture of a valuable right." *Id*. at 151.

The implications of a case like the present one were not before the supreme court in *Barshop*. Again, the *Barshop* court was addressing only whether the EAA Act effected a taking, a conclusion it avoided by holding that the March 1, 1994 filing deadline should not be applied literally. But in doing so, the court used broad language that, perhaps inadvertently, inextricably fixed the beginning of the legislatively intended six-month filing period at the date the EAA Act

---

[16] *See also Barshop*, 925 S.W.2d at 629 ("The Legislature obviously did not foresee the delays that would preclude the Act from taking effect in 1993. If it had, the Legislature could have simply stated that declarations of historical use had to be filed six months after the effective date of the Act.").

became enforceable. *Id.* at 630. We are bound to follow the supreme court's holding unless and until it revisits *Barshop* to clarify its scope and application. We accordingly sustain the Authority's first issue and hold that the Authority was acting within its authority in promulgating its rule setting the historical use filing deadline on Monday, December 30, 1996, the first working day following six months after the supreme court issued its *Barshop* opinion.

**Substantial compliance**

In its second issue, the Authority argues that the district court erred in submitting to the jury the question of substantial compliance with the Authority's filing requirements. It urges that a deadline cannot be susceptible to substantial-compliance claims as a matter of law.[17] When there

---

[17] The Authority raised this complaint in the district court in a summary judgment motion and in a directed verdict. It also urges that the district court was required to give additional instructions in the substantial compliance issue to the effect that compliance with the Authority's December 28, 1996 deadline was an "essential element" of that claim.

The district court ultimately submitted the following question:

Did Chemical Lime, Ltd. substantially comply with the requirements for an application to the Edwards Aquifer Authority for an initial regular permit?

A party substantially complies if the party complies with the essential requirements of the statute or rule. Substantial compliance does not require literal and exact compliance with every requirement of a statute or rule.

In determining whether Chemical Lime substantially complied with the requirements, you may consider whether the Edwards Aquifer Authority's ability to carry out its duties was prejudiced by the timing of Chemical Lime's filing.

In determining whether a party substantially complied with a requirement of a statute or rule, you may consider whether the failure to exactly comply was intended to evade or frustrate the purpose of the statute or rule.

26

is a claim that the jury charge included a mistaken application of the law, we review the jury instructions *de novo*. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002). We will not reverse unless we find that an error in the jury charge caused an improper judgment to be rendered. Tex. R. App. P. 44.1(a)(1); *see also Roberson v. City of Austin*, 157 S.W.3d 130, 138 (Tex. App.—Austin 2005, pet. denied).

"Substantial compliance" regarding a deadline refers to a concept that has been recognized by Texas courts primarily in tax protest cases. Where a party has taken steps to preserve its right to protest tax liability but has not fully complied with preservation requirements, such as partially paying a tax or arranging for installment payments of a tax, we have held that such actions may nonetheless constitute "substantial compliance" satisfying preservation requirements. *J. C. Evans Constr. Co. v. Travis Cent. Appraisal Dist.*, 4 S.W.3d 447, 451 (Tex. App.—Austin 1999, no pet.); *see Harris County Appraisal Dist. v. Krupp Realty Ltd. P'ship*, 787 S.W.2d 513, 515 (Tex.

---

The Authority objected to this question, stating, in relevant part, that the question lacked an instruction as to the essential elements for filing a declaration under the EAA Act. It then offered its own instruction, that the deadline for filing the declaration was December 30, 1996, and

> [y]ou are further instructed that the essential elements of the Edwards Aquifer Authority Act and accompanying rules of the Authority for filing an application for an Initial Regular Permit include but are not limited to the filing of a written document with the Authority on or before December 30, 1996.

The district court overruled the Authority's objection and refused its proposed instruction. Because we conclude as a matter of law that Chemical Lime could not invoke substantial compliance on these facts, we need not consider whether the district court abused its discretion in overruling the Authority's objection to the form of the submission and in refusing the instruction.

27

App.—Houston [1st Dist.] 1990, no writ); *Missouri Pac. R.R. Co. v. Dallas County Appraisal Dist.*, 732 S.W.2d 717, 721 (Tex. App.—Dallas 1987, no writ). However, where a party has failed to take *any* steps to preserve the protest prior to the deadline, Texas courts have declined to consider whether the taxpayer substantially complied through actions taken after the deadline. *Harris County Appraisal Dist. v. Dipaola Realty Assoc., L.P.*, 841 S.W.2d 487, 489 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Filmstrips & Slides v. Dallas Cent. Appraisal Dist.*, 806 S.W.2d 289, 291 (Tex. App.—Dallas 1991, no writ). Instead, they have viewed the question of compliance with the protest deadline as not susceptible to a substantial compliance analysis. *Harris County Appraisal Dist. v. Consolidated Capital Properties IV*, 795 S.W.2d 39, 41 (Tex. App.—Amarillo 1990, writ denied) (mandatory time requirement for paying property tax not reasonably susceptible to substantial-compliance review). This is consistent with decisions of the United States Supreme Court, which have held that compliance with a statutory filing deadline is generally not susceptible to analysis for substantial compliance. *See United States v. Locke*, 471 U.S. 84, 100-01 (1985); *United States v. Boyle*, 469 U.S. 241, 249 (1985). In *Locke*, for example, the supreme court rejected the application of substantial compliance review to a statutory deadline concerning federal mining claims.

> The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle. If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced. "Any less rigid standard would risk

encouraging a lax attitude toward filing dates." *United States v. Boyle*, 469 U.S. [241, 249 (1985)]. A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day.

*United States v. Locke*, 471 U.S. 84, 100-01 (1985).

In this case, it is undisputed that Chemical Lime did not attempt to file its historical use declaration until after the December 30, 1996 deadline. Chemical Lime urges that we can apply a substantial compliance analysis to its failure to meet the December 30 deadline. We find no support in Texas law for doing so,[18] and we are persuaded by the Supreme Court's reasoning in *Locke*: if failure to meet a deadline can nonetheless "substantially comply" with it, the meaning and relevance of deadlines would inevitably be eroded. *Id*. Such a result counsels us that, where the legislature or an agency acting within the scope of its delegated powers has properly established a

---

[18] In fact, Chemical Lime cites only one case from Colorado to support its argument that substantial compliance analysis may be applied to a deadline. *See In re Title, Ballot Title & Submission Clause*, 4 P.3d 485, 493 (Colo. 2000). Colorado statutes require that the Colorado office of state planning and budgeting file a fiscal impact statement by noon on the Friday before the meeting of the initiative title setting board, which drafts the title and ballot wording of citizen initiatives. *Id*. at 490-91. The office of state planning and budgeting filed its statement at 12:05 P.M. on March 31, 2000, and corrected errors in that report at 3:15 P.M. *Id*. at 491. The plaintiffs claimed that, under Colorado statutes, the initiative title setting board lacked jurisdiction to consider the ballot initiative at its April 5 meeting; instead, it had to wait until April 19. *Id*. The Colorado Supreme Court held that the deadline was not jurisdictional in light of the Colorado Constitution's fundamental "right of initiative and referendum," *id*. at 492 (quoting *Loonan v. Woodley*, 882 P.2d 1380, 1383 (Colo. 1994)), and the problems that would arise if the "staff of a government agency would have the power to delay progress on an initiative simply by retaining the requested fiscal information until a few minutes after noon on the Friday before the scheduled hearing." *Id*. It noted that the substantial compliance issue arose not from compliance "within the power of the proponents themselves" but of the staff of a state agency, who could thwart the rights of Colorado citizens by non-compliance. *Id*. We find that the analysis in that case has no bearing on the dispute before us now.

deadline, it is beyond our power to undermine it by applying a substantial-compliance analysis, which appears to be purely a judge-made creation of common law.

Chemical Lime attempts to distinguish cases like *Locke* on the basis that they involved straightforward, clearly-established deadlines, whereas here there was some uncertainty regarding the appropriate deadline. We acknowledge the difficulty we encountered when addressing the Authority's first issue concerning exactly when the EAA Act took effect and how the statutory historical use declaration filing deadline should be applied. However, these difficulties do not give rise to an exception from the principle that deadlines are not subject to substantial compliance review. *Barshop* compelled us to sustain the Authority's first issue and hold that the Authority acted within its statutory authority in setting a deadline of December 30, 1996 to file historical use declarations. Chemical Lime does not challenge the validity of this deadline on any other basis. In addition, the record establishes that Johnson, in attempting to complete the application, was aware of this deadline and did not raise his substantial-compliance and related claims of deadline until afterward.

Finally, Chemical Lime contends that it "substantially complied" because it inquired with the Authority prior to the deadline and alleges it was informed by an agency staff member that it could wait to file its declaration until it had compiled all required historical use information. Instances of agency "run-around," such as those alleged here, undermine the trust and confidence of the people of the State of Texas, those whom agencies are ultimately charged with serving. As an appellate court charged with applying governing legal principles to such evidence, however, we can find no support for extending substantial compliance analysis here. The United States Supreme

30

Court in *Locke* characterized a similar complaint as one of equitable estoppel, not substantial compliance. *See Locke*, 471 U.S. at 90 n.7. No estoppel claim was raised below, and we cannot consider it here. *See Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (issue must first be raised in district court to be considered on appeal).

We conclude that, as a matter of law, Chemical Lime's noncompliance with the December 30, 1996 deadline in this case is not susceptible to analysis for "substantial compliance" and that the district court could not have submitted a substantial-compliance issue to the jury. We sustain the Authority's second issue. Because we have sustained the Authority's second issue, we have no need to discuss its third issue, that there is no evidence to support a finding of substantial compliance.

**Attorney's fees**

The district court awarded attorney's fees under the Uniform Declaratory Judgments Act (UDJA) because Chemical Lime was the prevailing party and because it found that such award was reasonable and just. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. In its fourth issue, the Authority presents two challenges to the district court's award. First, the Authority argues that Chemical Lime could not recover attorney's fees under the UDJA because a declaratory judgment action was not a proper vehicle for bringing its claims. Instead, it contends that the water code provides the sole remedy and that the water code does not support an award of attorney's fees to Chemical Lime. Second, the Authority urges that, as the prevailing party, an award of attorney's fees to it is now mandatory under the water code. *See* Tex. Water Code Ann. § 36.066(g).

31

Attorney's fees are recoverable only when provided for by statute or by the parties' agreement. *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992). In this case, the dispute centers on which statutory provision, the UDJA or water code section 36.066 controls. Statutory construction matters present questions of law that we review *de novo*. *Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002). In construing a statute, our objective is to determine and give effect to the legislature's intent. *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004); *see also* Tex. Gov't Code Ann. § 312.005 (West 2005). If the statutory text is unambiguous, we "must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results." *Mega Child Care, Inc.*, 145 S.W.3d at 177. Legislative intent is derived from the entire act, not just its isolated portions. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

Generally, a party proceeding under the UDJA may recover its attorney's fees. Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The grant or denial of attorney's fees under the UDJA is within the district court's discretion, and its order will not be reversed on appeal absent a clear showing that the court abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985); *Del Valle Indep. Sch. Dist. v. Lopez*, 863 S.W.2d 507, 513 (Tex. App.—Austin 1993, writ denied). The legal principle encompassed in the term "abuse of discretion"concerns a legal error committed by the district court in its award of attorney's fees that injured or prejudiced appellants. *Lopez*, 863 S.W.2d at 513. We review a question of legal error *de novo*. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 314 (Tex. App.—Austin 1997, pet. denied).

It is an abuse of discretion to award attorney's fees under the UDJA when the relief sought is no greater than relief that otherwise exists by agreement or statute. *See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc.*, 31 S.W.3d 750, 753 (Tex. App.—Austin 2000, pet. dism'd by agr.); *University of Tex. v. Ables*, 914 S.W.2d 712, 717 (Tex. App.—Austin 1996, no writ). To establish jurisdiction under the UDJA, a party must plead the existence of an "underlying controversy" within the scope of section 37.004 of the civil practice and remedies code. *See Kadish v. Pennington Assocs., L.P.*, 948 S.W.2d 301, 304 (Tex. App.—Houston [1st Dist.] 1995, no writ). When a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant remedies. *Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.—Austin 2002, no pet.) (citing *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 911 (Tex. App.—Austin 1998, pet. denied)). "There is no basis for declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a judicial declaration would add nothing to what would be implicit or express in a final judgment for the enforceable remedy." *Universal Printing Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). It is an abuse of discretion, therefore, to award attorney's fees under the UDJA when the statute is relied upon solely as a vehicle to recover attorney's fees. *Texas State Bd. of Plumbing Exam'rs*, 31 S.W.3d at 753.

We first consider whether the challenging the Authority's rules is an action brought under chapter 36 of the water code. The legislature specifically permitted suits against a water district under chapter 36 of the water code; it also declared that the Authority "has all the rights,

33

powers, privileges, authority, function, and duties" provided by chapter 36. *See* Tex. Water Code Ann. § 36.066(a); EAA Act § 1.08; Act of May 29, 1995, 74th Leg., R.S., ch. 933, § 2, secs. 39.001-.359, § 6, 1995 Tex. Gen. Laws 4673, 4679-4701; Tex. Water Code Ann. § 36.066, .251 (West 2000 & Supp. 2005); *see also* Tex. Water Code Ann. § 36.205(e)(1) (West Supp. 2005) (denying to Authority the general water district authority to assess production fees as granted in section 36.205(c)). Chemical Lime argues that it is not a right, power, privilege, authority, function, or duty of the Authority to be sued and that, therefore, section 36.066's attorney's fees provisions do not apply. We reject that position because we conclude that the right to attorney's fees upon prevailing in a suit against it is a right of the Authority as contemplated by the legislature. Therefore, we must consider the language of section 36.066 in considering this issue. We consider the UDJA's attorney's fees provisions together with the specific language of water code section 36.066, because statutes are to be construed together, and, if possible, conflicts between them are to be harmonized. Tex. Gov't Code Ann. § 311.026 (West 1998). On the other hand, in the case of an irreconcilable conflict, the specific statute controls over the more general statute as an exception to the general provision. *Id*.

The remedies available under chapter 36 are not exclusive. *See* Tex. Water Code Ann. § 36.254 (West 2000) (provisions of chapter 36 "do not affect other legal or equitable remedies that may be available"). In particular, water code section 36.066 permits parties to sue water districts such as the Authority. *See id*. § 36.066(a). However, it also specifically provides that

> If the district prevails in any suit other than a suit in which it voluntarily intervenes, the district may seek and the court shall grant, in the same action, recovery for

34

attorney's fees, costs for expert witnesses, and other costs incurred by the district before the court. The amount of the attorney's fees shall be fixed by the court.

*Id*. § 36.066(g).

In this case, the legislative intent is clear—if the Authority prevails in a suit (other than one in which it voluntarily intervenes), an award of attorney's fees to it is mandatory should the Authority request them. Whatever rights Chemical Lime may have had to attorney's fees under the UDJA generally, those rights would conflict with the water code section 36.066, and, as the specific statute, the water code's attorney's fees provisions must prevail. In light of our disposition of the Authority's previous issues, we must sustain the Authority's fourth issue, reverse the district court's award of attorney's fees to Chemical Lime, and render judgment awarding attorney's fees to the Authority for $253,525.50 for the trial court proceedings and $50,000 for the appeal before this Court, amounts to which the parties have previously stipulated.

## CONCLUSION

Because we are bound by *Barshop*'s holding that the EAA Act's historical use filing deadline is "six months after the Authority becomes effective," 925 S.W.2d at 630, and because the EAA Act became enforceable on June 28, 1996, we reverse the judgment of the district court and render judgment that the Authority acted under its statutory authority in setting a deadline for filing declarations of historical use of December 30, 1996. We also reverse the portion of the judgment holding in the alternative that Chemical Lime substantially complied with the deadline, as we can find no support for applying the substantial compliance concept to the present facts. Finally, we must reverse the trial court's judgment granting Chemical Lime attorney's fees and render judgment

awarding attorney's fees to the Authority for $253,525.50 for the trial court proceedings and $50,000 for the appeal before this Court, amounts to which the parties stipulated.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Reversed and Rendered

Filed:   February 10, 2006